CLARA MEDLEY, *vs.* LEWIS WILLIAMS, *et al*, LESSEE.
June 1835.

The plaintiff in ejectment declared for certain tracts or parcels of land called *Cole's Addition*, "*Roberts Freehold*," and *Pasture Ground*, being the dwelling plantation of W. Defence was taken on warrant and not guilty.— *Held*, that general reputation was inadmissible to prove that the dwelling plantation of W, consisted of the three tracts of land mentioned in the declaration.

Evidence of general reputation is inadmissible except in enumerated cases, in which necessity, or very strong claims on the score of convenience require its production, and the instances are avowedly exceptions to the general rule.

To entitle a party to such evidence he must show that his case constitutes an exception according to an acknowledged rule of law, or some judicial decision; at least, that it is entirely within the reason, and spirit of an acknowledged exception.

Plots in ejectment are part of the pleadings made to elucidate conflicting locations, and by which parties are notified of the precise grounds of adversary claims, and enabled to resist them—they require as much precision and certainty as other pleadings, and no title paper not located can be offered in evidence.

Clara Medley *vs.* Williams.—1835.

Whether the State has passed its title to the lands in controversy, is always a fact to be ascertained in ejectment either by admission or by proof. The mode of proving this, is by producing first a grant, and next, evidence that the land claimed is within the lines of the grant.

When the plaintiff declared in ejectment for certain tracts of land, viz. C. R. and P, *being the dwelling plantation of W*, these latter words are only terms of additional description, and did not impose upon the plaintiff the necessity of proving that they did in fact compose the dwelling plantation of W, if he could otherwise have proved a good title to them.

I by his will made in 1815, after devising one-third of his dwelling plantation to his wife for life, bequeathed all the rest and residue of his estate to his daughter M in fee. This daughter was the *only* child born of the testator and her mother, the defendant in ejectment; she died a minor, seized of lands which she derived under her father's will, never having been married. *Held*, that in this case, the same quantity and quality of estate was devised, as the devisee, M would have acquired by descent, and that the title therefore vested in her by descent, and not by the devise; and upon her death intestate, a minor and without ever having had issue, the estate descended to her heirs at law, of her uncles and aunt, of the whole blood on her fathers side, and their descendants.

The words of a Statute shall be taken in their known sense.

The object of the framers of the act of 1785, was to alter and regulate the common law rule of descent, and the whole subject was before them.

When that act speaks of a dying intestate, it is descriptive of the cases intended to fall within its operation, cases included within its letter and spirit—and hence, where there is a will in fact, which does not operate—as this is no will—a will operative only in part—as this is no will as to the residue—and a will which gives the same estate in quantity, quality and mode, as the devisee would have taken without it, these are all cases of intestacy within the meaning of that act.

The plaintiff in ejectment must recover on the strength of his own title, and except in cases of estoppel, such as ejectments on a mortgage, and like cases, the defendant has no need to claim title.

I devised lands to his son W, and from whom they descended to his only daughter as above stated, upon her death her mother claimed them as heir to her daughter; in an action of ejectment, brought by the heirs at law of the daughter on the part of her father in whom the title was held to vest, the declarations of the grandfather and father of the daughter as to the true location of the lands were held to be inadmissible evidence.

APPEAL from ST. MARY's County court.

EJECTMENT by the appellee, against the appellant, instituted 5th January 1822, for certain tracts, or parcels of land, called "*Cole's Addition,*" "*Roberts Freehold,*" and "*Pasture Ground,*" being, as described in the declaration, "the dwelling plantation of *J. Williams,* late of *Saint Mary's* county, deceased.

Defence was taken on warrant, and not guilty pleaded.

The cause was first tried, and there was a verdict and judgment for the plaintiff in the County court, at August term 1824, from which an appeal was taken to the *Court of Appeals*, and the judgment being reversed at its June term 1826, the record was remanded to the County court, with a procedendo.

At the second trial the plaintiff read in evidence, the certificate and grant of the tract of land, called "*Cole's Addition,*" dated 3d January 1757, and also the wills of *James Williams*, and *Joseph Williams*, dated the first, 12th September 1812, the latter the 29th of March 1815.

The will of *James*, devised to his son *Joseph*, " the dwelling plantation wherein he, (the testator) lived, to him, his heirs and assigns for ever."

In the will of *Joseph Williams*, after devising " one-third of his dwelling plantation to his wife for life," and making some other dispositions, the testator " gives and bequeaths, all the rest, and residue of his estate, both real and personal, to his daughter *M. J. Williams*, to her, and her heirs for ever."

The plaintiff also produced a witness (*Wm. Woodward*) who had been sworn on the survey, who proved, that the said *James Williams*, lived for thirty years past; and by *Cornelius Manning*, who was sworn on the survey, that the said *James Williams*, lived for forty-five years past, on the land mentioned in the said declaration, as the dwelling plantation of the said *James Williams*, who there died. That the said *Joseph Williams* entered upon the said lands. That it was the general reputation of the neighbourhood, that the said lands consisted of the several tracts of land in the said declaration mentioned, called " *Cole's Addition,*" " *Roberts' Freehold,*" and " *Pasture Ground.*" That he was sworn on the survey in this cause at A, marked in the plats, and pointed out that spot, as the beginning of the dwelling plantation of *James*, and *Joseph Williams*. To the admissibility of which testimony the defendant objected; but the court (KEY, A. J.) decided the said testimony to be admissible. To which opinion of the court the *defendant's counsel objected.*

And the plaintiff then offered in evidence, the patent of a tract of land called "*Pocomick Point*," and other parcels of land, containing in the whole 1250 acres, granted to *John Medley*, June 20th 1651, and also the patent of a tract called "*The Pasture Ground*" granted to *Ths. Janus*, June 10th 1758.

To the admissibility of which as evidence, the defendant objected, upon the ground that the said patents are not located on the plats filed in this cause; but the court overruled the objection, and permitted the said patents to be read to the jury. *The defendant excepted.*

The defendant then gave in evidence that *Mary Jane Williams*, the devisee mentioned in the will of the said *Joseph Williams*, was the daughter, and only child of the said *Joseph Williams*, and the defendant, *Clara Medley*, and that said *Mary Jane Williams* died a minor seized of the said lands; leaving no child, or descendants, or brother or sister of the whole blood, nor any descendant from such brother or sister, nor father living; but leaving *Lewis Williams* one of the lessors of the plaintiff, an uncle of the whole blood, and *James J. Gough*, and *Stephen H. Gough, Peter Gough*, and *Ann P. Manning*, (who intermarried with *Robert Manning*) the other lessors, who are the children of *Eleanor Gough* deceased, who was an aunt of the whole blood of the said *Mary Jane*. The defendant then prayed the court to instruct the jury, that if they find from the evidence that *Mary Jane Williams*, was the daughter and only child of the said *Joseph Williams*, and the defendant *Clara Medley*, and died leaving no child or descendant, or brother, or sister of the whole blood, nor any descendant from such brother or sister, nor father living, that then the lessors of the plaintiff are not entitled to recover. But the court refused to give the instruction; and *the defendant by his counsel excepted.*

The plaintiff then gave in evidence by the said *William Woodward*, who was sworn on the survey, and pointed out the spot marked A, on the plat, as the beginning line of the dwelling plantation of the said *James and Joseph Williams*, having derived his information from the said *James*

*Williams,* and the said *Joseph Williams,* who was the father of *Mary Jane Williams,* under whom the lessors of the plaintiff, *or* the defendant claim title.

To the admissibility of this proof, the defendant objected, but the court overruled the objections, and permitted it to go to the jury. The defendant excepted, and the verdict and judgment being against her, she prosecuted an appeal to this court.

The cause was argued before ARCHER, DORSEY, and CHAMBERS, Judges.

J. M. S. CAUSIN, for the appellant.

1. The first question is, whether the proof of general reputation could establish the fact that the dwelling plantation of *James Williams,* consisted of the three tracts mentioned in the declaration, and he insisted it could not be done, because it is susceptible of better proof. 1 *Stark. Ev.* 61. *Norris Peake* 78. 1 *Phillips Ev.* 205. Neither could the patents for those tracts be read, because they were not located. *Blessing vs. Houses Lessee,* 3 *Gill and Johns.* 290. *Canal Company vs. Rail Road Company,* 4 *Gill and Johns.* 193. *Ib.* 205.

2. *Woodward* the witness, whose evidence was let in to prove the boundary, derived his knowledge from the parties, under whom the plaintiffs claim, and his proof consequently should have been rejected. At the time they communicated the fact to the witness, they had an interest in establishing the boundary at that point; and the admissibility, or inadmissibility of the proof, depends upon the state of the case there.

3. *Mary Jane Williams* the devisee in the will of *Joseph Williams,* took by purchase and not by descent, and consequently upon her death the lands devolved upon her mother the appellant. 2 *Sand. Rep.* 7, 8, *note F.* The reasons which influence the courts in *England,* to prefer that the estate should vest by descent, rather than by purchase, are not

9

applicable to our laws, because here, whether the lands are acquired in the one way, or the other, the rights of creditors are protected, and the devisee, or the heir take subject to their claims, which is not the case in England. 2 *Rolle* 352. 2 *Lord Raymond* 829. 1 *Wm. Black. Rep.* 188. 2 *Wm. Black. Rep.* 687.

In *Maryland*, whenever a will is made, no matter who may be the devisee, or the nature, or quality of the estate devised, the devisee takes under the will, and is consequently a purchaser. The single circumstance of making a will, demonstrates the intention of the testator, that the party shall take under it. If he did not design to change the title, from that which the law would devolve on his heir, why make a will at all. It would be performing an idle and unmeaning ceremony. Whether the devisee is in by purchase or descent, is a question of great importance, in reference to the act to direct descents, the ulterior descent of the property, being essentially different in the two cases. The act to direct descents only applies to cases of *intestacy*, and cannot apply when there is a will, although the same estate, may be created by the devise; which the law would throw upon the devisee, a party therefore who claims as heir under the act, must show an intestacy, that is, either that there is no will at all, or that its provisions, if there be one, do not extend, to the subject claimed by him. Unless he does this, the act does not apply, and his pretensions founded upon it are invalid. *Hall vs. Jacobs*, 4 *H. & J.* 245.

V. H. Dorsey, and Stonestreet for the appellee.

1. The declaration is in effect for the dwelling plantation, *eo nomine*, composed of the several tracts by their patent names. It had acquired that name by reputation, to prove which hearsay evidence was admissible. *Wall vs. Forbes*, 1 *Harr. and Gill* 441.

2. If there had been any controversy in reference to locations, still the patents would have been admissible in evidence; but there was no dispute upon that subject, the whole turning

upon a question of title. *Hall vs. Gough*, 1 *H. and J.* 120. *Hall vs. Gittings*, 2 *H. and J.* 383. *Beall vs. Bayard*, 5 *H. and J.* 129, 510. *Blessing vs. House's Lessee*, 3 *G. and J* 290.

3. The declarations of *James and Joseph Williams* were good evidence, as between the parties to this cause, all of whom claim under them. *Long's Lessee vs. Pillett*, 1 *H. and McH.* 531. *Weems vs. Desney*, 4 *H. and McH.* 156.

4. *Mary Jane Williams* took by descent, and not by purchase. This is confessedly so, by the law of England. 2 *Lord Raymond* 830. 1 *Salk.* 241, and that law in this respect, has not been changed by our act of descents. *Hall vs. Jacobs*, 4 *H. and Johns.* 245.

CHAMBERS Judge, delivered the opinion of the court.

The first opinion which the exception in this case presents for revision, is, that evidence of general reputation is admissible, to prove that the dwelling plantation of *James Williams*, consisted of the three tracts of land mentioned in the declaration.

We think the court erred in permitting the testimony to go to the jury.

Evidence of general reputation is inadmissible except in enumerated cases, in which necessity, or very strong claims on the score of convenience, require its production, and the instances are avowedly exceptions to the general rule. To entitle a party to such evidence, he must shew that his case constitutes an exception, according to an acknowledged rule of law, or some judicial decision, at least, that it is entirely within the reason, and spirit of an acknowledged exception. We do not think that has been, or can be done in the present case. When the proof by reputation is admitted at all, it is to supply information in cases, where more certain and positive evidence is not likely to exist. But in a case like the present, there must always be better evidence in the power of the party.

If the " dwelling plantation" does consist of the tracts of

land named, the safe and practicable mode is to locate the several tracts, and to locate the dwelling plantation, and it will be manifest whether they are the same.

The next opinion to which exception was taken, makes it our duty to decide, whether the two patents, one for the tract, said in the exception to be called "*Pocomick Point*," and the other "*The Pasture Ground*," were properly admitted to go to the jury, and we think there is error also in the opinion of the court below upon this point.

Plots are part of the pleadings, made to elucidate conflicting locations, and by which parties are notified of the precise grounds of adversary claims, are enabled to resist them. They require as much precision and certainty as other pleadings, and this court has decided, that no title paper not located shall be offered in evidence, upon the well established principle of correspondence, between the allegation, and the proof. *Hughes vs. Howard,* 3 *H. and J.* 13. *Mundell vs. Perry,* 2 *G. and J.* 193. When the plaintiff offered the patent for 1250 acres, and that for "*Pasture Ground*," was there any location with which either of them corresponded? We think not.

The appellee's counsel doubted to what purpose the patent for the 1250 acres was offered, and suggested that it was useless, and therefore productive of no injury, of which the appellant could complain. If the court below did admit the paper as evidence when it could have no relation to the issue, it erred in doing so. But we think the patent must have been intended to shew, that the *State* had granted the land claimed as "*Roberts Freehold.*" The patent is a very peculiar one. It grants to *John Medley* sundry parcels of land, of which some are said to be thereby originally granted to himself—others are recited to have been theretofore granted to other persons, and assigned to him—some of the parcels by one name, some by another, and others without name, apparently in detached positions, and no name is given to the whole.

In the number of parcels included in this patent, is one called, "*Roberts Neck*," said to be laid out for one hundred

acres. Unless the plaintiff intended to rely on this patent, to shew that the land therein called "*Roberts Neck*," is the land called in the declaration " *Roberts Freehold*," and thus to prove that the State had parted with its title, there is not a shadow of evidence to prove a grant from the *State*, for a large part of the plaintiffs claim.

The necessity of furnishing such proof appears to have induced, the production of these two patents. Whether the State has passed its title to the lands in controversy, is always a fact to be ascertained in ejectment, either by admission, or by proof. There is no pretence of admission in this case. The mode of proving it, is by producing, first a grant, and next evidence that the land claimed is within the lines of the grant. The production of the grant proves that the State has parted with the land therein granted, but it leaves entirely unascertained, the other equally important fact, that the land granted, is the identical land claimed.

To allow the surveyor's certificate to establish the fact, would be in effect to dispense with proof, for the warrant of resurvey, which is the surveyor's authority, requires him to make such locations as the plaintiff, or defendant may direct, and his certificate is but the allegation of the party. The rule requiring the plaintiff, to shew the grant of the *State*, does not impose the duty as an idle ceremony, the proof must be legally sufficient to establish the fact. It is difficult to conceive how it would be possible to prove by *corresponding* testimony, the correct position of each one of the three several tracts composing the dwelling plantation, when in regard to two of them, neither the beginning boundary, nor a single line is located.

The appellee's counsel however contend that they do not claim the three tracts, *eo nomine*, but they claim the " dwelling plantation" of *James Williams*.

If this were so, it would not relieve the plaintiff below, from the necessity of locating them for the reasons just mentioned.

But we think the counsel mistaken in point of fact.   The language of the declaration we think asserts a claim to the three tracts, and the expressions, " being the dwelling plan- tation," &c. are but additional description, and did not impose upon the plaintiff below, the necessity of proving, that they did in fact compose the dwelling plantation of *Williams,* if he could otherwise have proved a good title to them.

But again, the plaintiff lays down his claim and pretensions for the " entire tract," as the surveyor calls the *three tracts in union,* the lines of which extend beyond the " dwelling plan- tation," and the verdict has been given for this excess, as well as the other part of the land, all which is certainly irreconcileable with the hypothesis of the appellee's counsel.

The application to the court below on which the next opinion was expressed, was undoubtedly intended to raise the question, whether under the circumstances stated, the lessors of the plaintiffs were the heirs at law of *Mary Jane Williams.*

As the question has been elaborately argued, and the appellants counsel has urged its decision, as conclusive of the principal point, upon which the defence to this action rests, we will not stop to enquire, whether by the strict construction of the act of 1825, ch. 117, we might not avoid it.

The devise gives no interest in the land to *M. J. Williams,* which she would not have taken without it, nor is it given in any different mode.   After other devises and bequests, *Joseph Williams* gives the rest and residue of his estate, real and personal, to her and her heirs for ever.   The land in contro- versy was part of this residue.   *M. J. Williams* had therefore the same interest precisely, and to be held, and enjoyed in the same manner, as if those previous devises and bequests, having been made, the will of her father had been silent as to the land devised by the residuary clause.   In other words as if he had died intestate as to this land.   It is a case then in which the same quantity and quality of estate is devised, as the devisee would have acquired by descent, and in such a case, it is a clear rule of the common law, that the title shall vest by the worthier title—by descent, and not by devise.

It is a familiar rule of construction that words in a statute shall be taken in their accepted, and known sense. The objects of the framers of our act was to alter and regulate the common law rule of descent, and the whole subject was before them.

It would seem difficult therefore to assign a reason why in using a well known term, without qualifying it, they are to be understood as designing to abridge its known import, especially when by attributing to it, the proper and legal signification it had acquired, we do not at all conflict with any purpose they had in view. Why then deny to the words in the statute, the same latitude which they have in common law acceptation—that is to say, why shall they not be descriptive of the case at bar, and include it, as within both the letter, and spirit of the act?

But it is said the act speaks of an intestacy, as implied in every case of descent. It may well do so. A will that does not operate, is as no will. A will may operate in part, and in part be inoperative.

In the case before us, if *James Williams*, had omitted the clause in his will, by which the residue of his estate is given to his daughter, retaining all the other dispositions now found in it, he would clearly have been intestate as to the land now claimed. As by the rules of law, that clause does not pass the land to the devisee, but leaves it to descend to his only child, the will is so far inoperative, and a case of partial intestacy therefore exists. We are consequently of opinion that there is no error in the decision attributed to the court below on this point.

It has been urged that these principles of the common law have not been introduced into *Maryland*, and are contrary to the policy of our system.

We are of opinion that they are not only applicable to our system, but have been recognized and applied. The case in 1 *H. & J.* 478, *Philips vs. Dashiel's Lessee* was ruled on this ground, in the late General court, and this court adopted the

same doctrine in the late case of *Purnell's Lessee vs. Rider,* decided on the *Eastern Shore.*

The next and last opinion to which the defendant excepted arises upon a very singular statement.

It may well be doubted whether the words affirm any proposition, to which the witness was called to testify. The assertion that the " plaintiff gave in evidence by the witness," is immediately followed by another assertion, that he was sworn on the survey to point out a boundary, and then follows a recital of the fact that his information was derived from *James and Joseph Williams,* the last of whom, it is said was the father of *M. J. Williams,* under whom it is alleged the plaintiffs lessors, *or* defendant·claim title. But to what fact the witness was interrogated, or what he was offered to prove, and of course, to what evidence the defendant objected the exception does not inform us.

The argument has assumed the decision of the court to be, that the declarations of *Joseph and James Williams* as to the true location of their dwelling plantation might be given in evidence by the witness, and the appellee's counsel have endeavoured to sustain the decision, upon the ground that the defendant claimed under *Joseph and James Williams,* and was bound by their declarations.

It is not necessary to express an opinion as to the extent to which the defendant would be bound, if the record did expressly allege, that while objecting to the evidence of their declarations, the defendant at the same time relied on a title declared by her to be derived from *Joseph and James Williams.* This record does not make such an allegation.

The plaintiff in ejectment must recover on the strength of his own title, and except in cases of estoppel, such as ejectments on a mortgage, and like cases, the defendant has no need to claim title. It is not suggested that there is any thing in this cloudy exception, to deprive the defendant of the full benefit of this doctrine, except the expressions, " under whom the lessors of the plaintiff, or the defendant claim." But it is entirely clear that the person referred to as the party,

"under whom the plaintiffs lessor, or the defendant claims," is *Mary Jane Williams*, and not *Joseph or James Williams*.

Therefore without adverting to the effect which might arise from using the disjunctive, instead of the conjunctive particle, we can only say, that if the court below, did admit the witness to give evidence of the declarations of *James and Joseph Williams*, as to the location of their lands, they committed an error in so doing.

JUDGMENT REVERSED AND PROCEDENDO AWARDED.