# WILLIAM FRAZIER *vs.* HENRY M. WARFIELD.

The object and general purpose of the act of 1858, ch. 256, entitled, "An act to provide for the inspection, measuring and weighing of grain in the city of Baltimore," was to provide a competent and suitable officer to inspect grain, sold in that city, and to ascertain with fairness and accuracy the true quantity sold by weighing and measuring.

This act accomplishes this result, not by introducing a *new mode* of weighing and measuring, but by placing between the buyer and the seller, an impartial officer of the law, with duties defined, and their faithful performance secured by a bond and an oath.

Under this act the weight of *wheat* may be ascertained, by weighing one bushel in every sixty, according to the *long established usage* in the city of Baltimore, notwithstanding a particular section of the act says, the inspectors "shall also carefully weigh and determine the weight of *all wheat* that shall be inspected by them."

A cardinal rule in the construction of statutes, is, that the *intention* of the legislature shall be carried out, and that intention is to be collected from the words of the statute by considering *every part of it*, and it may also be ascertained by considering the cause or necessity of making the act, or from foreign circumstances.

The words of a statute must be taken in their *accepted* and *known* sense, and where particular terms have obtained a certain and definite meaning in a certain locality, that meaning must be given to them when used in a statute applicable to that place.

If the meaning of the words of a statute be uncertain, *usage* may be resorted to for their interpretation: doubtful words in a general statute may be explained with reference to general usage, and when a statute is applicable to a particular place only, such words may be construed by usage at that place.

Where great *inconvenience* will result from a particular construction, that construction is to be avoided, unless the meaning of the Legislature *be plain*, in which case it must be obeyed.

APPEAL from the Equity Side of the Superior Court of Baltimore city.

The bill in this case was filed, on the 17th of July 1858, by the appellee against the appellant, Inspector General of Grain, in and for Baltimore city, for an injunction to restrain proceedings, then pending before a justice of the peace of the city of Baltimore, which had been instituted in the name of the State, for the use of the defendant as informer, to recover the penalty of $25, under the 15th section of the act of 1858, ch. 256.

The questions presented by this appeal, involve the construction of this act of 1858, ch. 256. The injunction granted according to the prayer of the bill, prohibited the defendant from proceeding in the charge then pending before the magistrate, and also from instituting, as informer or otherwise, any similar charge against the complainant. After answer filed a motion was made to dissolve the injunction, and this motion was argued on bill, answer, and an agreement of facts, which with the allegations of the bill and answer, are fully stated in the opinion of this court, as well as in the following opinion of the court below, (LEE J.,) delivered, upon passing the order continuing the injunction:

"The questions presented for my decision are very interesting, not only as it regards the construction of a public law, operating upon an important branch of trade, but also from the application of a remedy which it is insisted that a court of equity can now only give. I shall, therefore, as briefly as possible, state the conclusion to which I have come, after hearing the able arguments in this case.

"The complainant is a merchant, engaged in the purchase and sale of grain, in the city of Baltimore, and in his bill, praying for the injunction, (to dissolve which the present motion is made,) sets forth, that in July last, he contracted, at the Corn Exchange, with a certain William S. Pawson, for the purchase of a lot or parcel of wheat, represented by a sample then exhibited by said Pawson, estimating the wheat, so contracted for, at 112 bushels, more or less, and that by the terms of contract, Pawson was to receive therefor, $1 for each and every bushel which the said lot of wheat contained, and that the said wheat had just arrived from the Eastern Shore of Maryland, and was then, for the first time, offered for sale in the city of Baltimore; that before this contract of purchase was consummated, the wheat was brought to the warehouse of the complainant and deposited, and immediately thereafter, the defendant, William Frazier, Inspector General of grain, in and for the city of Baltimore, was duly notified, by Pawson, that the wheat was ready to be measured and weighed, in conformity with the law of the State, and requested the defend-

ant, as such Inspector General, to measure and weigh said wheat, according to law, and perform his official duty in the premises. Whereupon the defendant replied, that after the wheat was measured, he would weigh it by weighing one bushel out of every sixty, or at that rate, and would not weigh it in any other manner.

"The complainant then alleges in his bill, that after waiting a reasonable time for the defendant to have the wheat weighed, and hearing nothing from him, he addressed letters to him on the subject; which correspondence is filed with the bill, and expresses distinctly the views of both the complainant and defendant, as to their construction of the act of 1858, creating the office of Inspector General of grain, and the duties which it imposed on the defendant as Inspector General. The complainant then alleges, that being unable to obtain the legal weight of the wheat, he was compelled to accept it and pay the price stipulated, in accordance with a pre-existing usage which had prevailed prior to the passage of the act creating the office of Inspector General of grain, and this was done without the agency of the defendant, or his assistants, as it related to the weighing and the measuring of the same.

"The complainant further alleges, that he was then arrested, at the instance, and by the procurement of the said Inspector General, Frazier, on a criminal charge, upon the information of said defendant, before Mr. Hayward, a justice of the peace for the city of Baltimore, as appears by the proceedings, by the said magistrate, in exhibits duly certified and made a part of the bill. Pending which, and before a final judgment thereon, by said justice of the peace, the complainant prayed that an injunction should be granted, and asked the interposition of the court, as a court of equity, to prevent the further prosecution of said proceedings by the defendant, and restraining him as informer, or otherwise, from instituting any further proceedings against the complainant in the premises, until a decision by this court.

"Upon the allegations and prayer of this bill, an injunction was issued on the 16th of July 1858. To this bill the defendant filed his answer on the 23rd of July, and protesting

36    v. 13.

Frazier *vs.* Warfield.

against the jurisdiction of the court, answers:    That a contract was entered into, on or about the 19th of July 1858, between the complainant and William S. Pawson, for the purchase of a lot of wheat, as stated in the complainant's bill, and does not deny the averments of the same in reference to said contract.    The defendant, as Inspector General of grain for the city of Baltimore, admits, that he received notice that the wheat was ready to be weighed, in obedience to the law in such cases made and provided, and that in his official capacity, as Inspector General, was then called on to measure and weigh the same, and was notified where it was deposited, and that he informed Pawson and the captain of the vessel, who brought the wheat from the Eastern Shore of Maryland, that after said wheat was measured, (it having been previously inspected,) he would weigh the same by weighing one bushel out of every sixty, or at that rate, and would not weigh the same in any other manner.    The respondent, further answering, states, that the wheat in question was inspected in strict conformity to the law regulating the same, and that at no time, as the letters filed with the bill show, did he refuse to perform the duties required of him by the law, as Inspector General of grain, either to weigh the wheat, or that he was in default in offering to measure the same, but on the contrary he asserts, that he then, acting in his official capacity, offered to have the wheat measured and weighed, according to the requirements of the act of 1858, regulating the inspection of grain in Baltimore city, and in accordance with the usage and custom operating in said city, at the time and for the period of fifty years prior to the passage of said act.    The answer then denies that the complainant was unable, by any default of the Inspector General, or his assistants, to obtain the legal weight of said wheat; that the complainant did accept the said wheat and pay the price stipulated for the same, in accordance with the prevailing usage, and without the agency of the respondent, or any of his assistants, but that the complainant accepted said wheat under the aforesaid usage, in plain violation, and in open defiance of the law regulating the inspection of grain in the city of Baltimore.    The respondent, further answering,

Frazier vs. Warfield.

alleges, that after the correspondence between the complain-
ant and himself, and the former had refused to have said wheat
weighed and measured by the officers duly appointed for the
purpose, in the manner pointed out in respondent's letter of
July 9th, that the complainant did then proceed to measure
said wheat, in precisely the same manner as the respondent
had proposed orally and in writing to do.  The answer also
denies, that the business of the complainant, and other per-
sons engaged in the purchase of grain, has been injured or
prevented, by the refusal of the respondent, or his assistants,
to perform their official duty.  The respondent then admits,
that regarding the course of the complainant, in having the
wheat measured and weighed without the agency of the In-
spector General, as a direct violation of the law regulating the
same, that *he instituted* suit against the complainant and his
co-partner alone, to recover the penalties provided by said law,
and denies that he seeks any personal benefit as informer, but
being the proper officer, appointed by the Governor of the
State, to carry out the law referred to, it was his duty, as an
officer, to carry out and execute the law; that he, therefore,
gave notice to the proper tribunal, of the violation of law,
upon which the suit against the complainant was instituted,
in the name of the State of Maryland, and which was pend-
ing before a magistrate or tribunal competent to determine the
rights of the parties, when the injunction in this case issued,
and denies that the complainant is remediless at law, but that
the magistrate is competent to hear the case and impose the
fine.  After thus answering the bill the respondent submits,
that he has taken the oath prescribed under the act of 1858,
and filed a bond as Inspector General of grain, in the penalty
of $10.000, for the faithful performance of the duties of his
office, and that he has, and is always ready, faithfully to per-
form his duty; and denies, finally, any dereliction of his official
duties, as charged in the bill; but that, assuming the allega-
tions of the complainant to be true, yet the complainant has
an ample legal remedy, and is not entitled to the equitable in-
tervention of this court, and also on the official bond of the
respondent, for any damage sustained by reason of the neglect

Frazier *vs*. Warfield.

of the respondent, in the discharge of his official duties, and that nothing in the complainant's bill can justify his violation of a law of the State.

"Upon this statement of the case, taken from the bill and answer, I shall proceed briefly to state and decide the questions raised and discussed, with much zeal and ability, by the counsel on both sides.

"The first and most important objection to the act of Assembly of 1858, regulating the inspection of grain, is, that the law is unconstitutional, and therefore inoperative. In this I cannot concur. The Legislature, under the Constitution of this State, have full power to regulate, for purposes of revenue, trade within the State. Indeed, from the earliest period of our history, it will be found that inspection laws have been passed and enforced without any doubt or question as to the power of the Legislature, under the old or new Constitution, to enact the same. Acts regulating the inspection of tobacco, of flour, fish, guano, &c., and imposing penalties for the violation of all or any of them, have been, and are now, recognized and executed without any objection; and no principle of constitutional law can be invoked, to deprive the Legislature of the power to define and regulate the mode and manner in which trade and commerce, within the State, shall be governed, where the rights of the citizen are not invaded, nor is he deprived of those secured to him by the Constitution itself, such as trial by jury, *habeas corpus*, and other cardinal privileges embraced in the organic law. In examining the act, entitled, 'An act to provide for the inspection, measuring and weighing of grain in the city of Baltimore,' passed March 9th, 1858, under which these proceedings have occurred, and the constitutionality of which is now denied, I find the same to be, in my judgment, strictly in accordance with the powers vested by the Constitution in the Legislature, or not withheld from it by positive prohibition.

"It has been conceded on both sides, (and could not have been doubted,) that laws regulating trade and commerce within the State, are not only constitutional, but obviously necessary and proper, for the objects of revenue and unifor-

Frazier *vs.* Warfield.

nity, and the present act is so regarded, except so far as the 8th section may be considered objectionable. But my construction of the whole, taking its sections together, does not enable me to see any defect in this regard, even in the 8th section. This 8th section provides, that where the purchaser refuses to receive the grain, without complaint as to the measure or weight, and it shall appear that six hours have passed since the sale took place, and no complaint has been made to the seller or his agent within that time, then it shall be presumed, unless clearly proved to the contrary, that the bulk does correspond with the sample, and the purchaser 'shall be compelled to pay all damages and charges that may have arisen by reason of his delay or refusal to comply with his contract; to be assessed and determined by the said Inspector General.' Now, I do not regard this section as depriving the party interested of a full trial before a jury, if desired; for although the inspector general may determine and assess the damages and charges, yet upon the party's refusal to pay them he could only be made to do so by a suit at law, before the proper tribunals of the State, where the duties, authority and power, of the Inspector General, and the rights and liabilities of the parties to the particular contract of sale or purchase, would be adjudicated. The 8th section does not say that the assessment of the Inspector General shall be final, but if it did, I am of opinion that all the questions arising properly in the determination of the suit, between the seller and the purchaser of wheat or grain, under this section, could be distinctly raised and adjudicated, as in other cases of contract or dealing between man and man, upon the general principles of the common law, and the decisions in this State. But if I am wrong, and this section is vicious on the ground of its unconstitutionality, it has been conceded, that if the remaining sections of this law are good, and can be carried out, the law will be so interpreted as to meet the benefit, or remedy the evils, the Legislature had in view by passing it. And regarding this law in its general object and provisions, as not only constitutional, but essentially necessary and beneficial to the revenue and trade of the State, I shall so adjudge; and pass now from this objec-

tion to the act, to the remaining questions upon which my decision must rest.

"The jurisdiction of this court as a court of chancery is denied, over the proceedings of the magistrate in this case.

"1st. On the ground that they were criminal in their form and character, and, as such, not within the power of a court of equity to arrest or discontinue by means of an injunction.

"Unquestionably, no principle is better settled in England or this country, than that a court of equity will not, indeed, cannot, interfere with criminal courts and the punishment of crime. The sources of equity jurisdiction are, it is true, large and comprehensive, embracing every degree of fraud, mistake, accident and misrepresentation, and affording to the party relief, where the strict rules of common and statute law could not. But over criminal jurisdiction it has never sought to extend its arms. Some of the ancient writers on English law have referred to one or two cases, where proceedings under 'informations, in the name of the crown,' have been enjoined; but it will be found, on examining those cases, that the judges regarded the action as in the nature of a civil suit, and, on this ground alone, English chancellors have assumed equity jurisdiction. In this country, however, the settled judgment of the courts and jurists is, that in no criminal case will a court of chancery interfere; and *Mr. Justice Story,* most eminent as a judge and author, in the *2nd volume* of his *Equity Jurisprudence, sec.* 893, says, 'They (the courts of equity) will not interfere to stay proceedings in any criminal matters; they will not grant an injunction to stay proceedings on a *mandamus,* or an indictment, or an information, or a writ of prohibition; but this restriction applies only to cases where the parties seeking redress by such proceedings are not the plaintiffs in equity, for, if they are, the court possesses power to restrain them, *personally,* from proceeding at the same time upon the same matter of right for redress in the form of a civil suit and a criminal prosecution.' See, also, *Eden on Injunctions,* 42. And in *sec.* 959, *(b.,)* this distinguished jurist also says: 'It may be remarked in conclusion, upon the subject of special injunctions, that courts of

Frazier *vs.* Warfield.

equity constantly decline to lay down any rule which shall limit their power and discretion, as to the particular case in which such injunctions shall be granted or withheld: and there is wisdom in this course, for it is impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights and redress wrongs.'

"Adopting, as I now do, the doctrine and views of Judge Story, so well expressed, let me enquire into the character and circumstances of this particular case, as it is presented by the papers before me.

"The proceedings before the magistrate to recover the penalty sued for by the respondent, Frazier, were not in the nature of a *mandamus*, or an indictment, or writ of prohibition, these being public writs, issuing from the crown or State, to enforce a public law, or punish its violation—the *mandamus;* to compel a public officer to perform his duty, and the other writs for purposes of general right. Is then this, which the respondent in his answer terms a *suit to recover* the *penalty,* provided by the act, such a proceeding before the magistrate as would place it within the definition of an 'information,' which is said by the law writers to be an accusation or complaint exhibited against a person for some criminal offence, either immediately against the king or against a private person, which, for its enormity or dangerous tendency, the public good requires should be restrained or punished? It differs from an indictment, principally, in this, that an indictment is an accusation found by the oath of twelve men; whereas, the information is only the allegation of the officer of the Crown who exhibits it. See 4 *Bl. Com.*, 307; *Wharton's American Law,* 97; *Jacob's Law Dictionary*. In this country, as Mr. Wharton states, 'informations,' as understood and used in England, are not in force, and very rarely in use. I am not able, therefore, to bring my mind to the conclusion, that a suit for the recovery of a penalty prescribed in a civil statute, like that before me, is, in its nature, an 'information,' and *criminal* in the sense contended for by the respondent. It is, I think, a mere *suit between* parties, the one having authority by law to sue for, as informer, and recover to his own use the pen-

alty; and the other, subjected by the same law, to its payment
for violating any of its provisions.   It is not a penalty imposed
as a *punishment* for criminal acts, and to be prosecuted for as
such; if no person should sue for, as informer, the penalty un-
der this act, there would be, in fact, no violation of the law
punishable at all.   Suits are often brought in the name of the
State, and indeed most of the bonds given to secure, in the
orphans court and elsewhere, the faithful performance of fidu-
ciary officers, are taken and sued upon in the name of the
State, but this does not deprive the proceeding of its real
character, that of a private civil suit or proceeding, for the
benefit of the parties to it.   If, however, I had any doubt on
this subject, the opinions of the Court of Appeals have, I think,
removed them, and must now control me in my decision of
this point, making it unnecessary to examine the English and
American authorities referred to in the argument.   In the case
of *Day vs. The State*, 7 *Gill*, 321, decided in 1848, the
Court of Appeals rule, 'that actions of debt, instituted before
a justice of the peace, for the recovery of fines imposed by the
act of 1846, in reference to lotteries, are *civil actions, and not
criminal cases or prosecutions*.'   This decision was practi-
cally sustained six years subsequent, in the case of *The State
vs. Mace, 5 Md. Rep.*, 337.   Although in these two cases,
the one decided before the new Constitution was formed, and
the other afterwards, the question is presented under a different
state of facts, yet, I think, it will be found, that the Court of
Appeals have adjudged suits before a magistrate for the recovery
of fines or penalties, imposed by law, to be civil and not crimi-
nal proceedings; and testing the present case by the rule thus
established, I cannot distinguish it from the penalty incurred
and sued for under the lottery acts.   The 15th section of this
grain act provides, that no person, except those appointed un-
der the act, shall inspect, weigh or measure any grain, and
imposes a penalty of twenty-five dollars for thus violating the
law; to be recovered in the name of the State, for the use of
the informer, before any justice of the peace in and for the
city of Baltimore.   And the lottery act of 1846, contains the
same provisions, differing only as to the amount of the pen-

Frazier *vs.* Warfield.

alty, and enacting that the same shall be recovered before a justice of the peace, in an action of debt, &c. And I find that other acts, regulating the inspection of merchandize, such as flour, tobacco, fish and guano, contain the same provisions. If I am right, therefore, in my understanding of the decisions of the Court of Appeals referred to, then this proceeding must be regarded as a civil proceeding, or, as the respondent, in his answer, has correctly called it, a suit to recover a penalty, in which the State has no interest, and the recovery of which, in no way, calls in action the criminal code of the State, or its tribunals of criminal jurisdiction.

"This then being so, the next question recurs, is there such a complete legal remedy for the complainant in this case, as will prevent a court of chancery from interfering? I think there is not. The magistrate's judgment, it is true, could be reviewed by the Court of Common Pleas, or the case tried *de novo* there, but from this judgment of the Common Pleas no appeal would lie to the court of final resort. The injunction issued in this case restrains the respondent only until the Court of Appeals shall hear and determine the duties and rights of the parties, under a proper construction of this law, as I take it for granted, that in any event, an appeal will be taken to the next term of that court, from my decision. Looking then to the remedy before the magistrate, or the Common Pleas, as not being a *complete* legal remedy, I cannot, on this ground, dissolve the injunction heretofore granted. If in error I shall be soon corrected, if right, as soon affirmed.

"It now becomes necessary for me, as a chancellor, to express my opinion upon the proper and true construction of this law, for the inspection of grain, and I shall briefly do so.

"Prior to the passage of this act, a usage prevailed, existing for many years, (the answer says fifty,) by which one bushel of wheat in sixty bushels was weighed, and in this way the index of weight of the wheat was determined, as between the buyer and seller. Upon representations, no doubt, of the inequality, uncertainty, and injustice sometimes, of this mode of weighing wheat, the Legislature, at its last session, passed the act in question, whose object was, as I understand it, to pro-

37      v. 13.

*Frazier vs. Warfield.*

vide a uniform and just mode of ascertaining the weight of
wheat, and the inspection and measuring of grain, and to place
between the buyer and seller—the farmer and the gentlemen
of the Corn Exchange—an impartial officer of the law, with
duties defined; and their faithful performance secured by a
bond and an oath.   Before the passage of this act, wheat had
been weighed according to the usage named, but the act in-
augurated a new mode, and in the fifth section declares, that
the said inspectors 'shall also *carefully* weigh and determine
the weight,' (not of wheat, which might have left it doubtful
whether this did not leave a discretion to weigh, as by the
usage, one bushel in sixty,) *'but shall* determine the weight
of *all wheat* that shall be inspected by them; or *carried to* the
said city for sale, and for this purpose shall procure, at reasona-
ble and proper cost, proper weights and scales to effect the
purpose herein contemplated,' &c.   Now I confess, after
much reflection, my inability to give to them any other mean-
ing than these words import.   Before the passage of the law
*all wheat* had not been weighed; by the law it is made impera-
tive, as a duty of the inspector, to remedy this, and weigh *all*
*wheat* brought to Baltimore for sale, and then provides him
with the apparatus or scales for performing this duty.   But it
has been ingeniously argued, that the Legislature intended, by
this language, only to indicate the old mode of weighing one
bushel in sixty.   If so, why furnish him with scales, after re-
quiring *all wheat* to be weighed?   The evil complained of,
under the old system, was the loss sustained by the seller and
farmer, as very often one bushel weighed would not correctly,
as it could not, give the true weight of the bushels not weighed.
To prevent, therefore, any loss or injustice, the Legislature
adopted the only plan that could attain this object, and that
was, providing, when required by the seller and purchaser,
for the weight of *all the wheat*.   Now I agree, that where the
words of a statute and its meaning are doubtful, well estab-
lished usage can be invoked to explain or interpret it, but
where the language of the law is plain and explicit, then the
court must construe it by its terms, and not by usage or cus-
tom.   There would have been, in fact, no necessity for this

Frazier *vs.* Warfield.

law, or no benefit in it, if the usage, which before had pre-vailed in the sale and purchase of wheat, had operated with equal justice upon the dealings of both parties. For I find, on examining carefully the sections of this act, that it looks to the establishment of an equal and impartial and disinterested tribunal for the inspection thereafter, and the measuring and weighing of grain in the city of Baltimore, guarding, as far as possible, the rights of both seller and buyer, and intending to introduce a new system in the place of the old. If the pur-chaser had been satisfied with the old system, the farmer had not, and to establish a better one was doubtless the purpose of the Legislature. If, however, the view and the position as-sumed by the respondent, the Inspector General, be the cor-rect one, and the construction given to the law by him be the true construction, the act, for all purposes, except as a revenue law, (and that would be small,) was unnecessary, and should not have been passed, because the Inspector General and his assistants do no more, under it, than was done before its enact-ment. In other words, it creates an office with no duties to perform. On the whole, I cannot adopt such reasoning; and regarding the law as a beneficial and just act, I shall construe it by its own words and carry out its obvious intent. *All* means *all*, and nothing *less*.

"With these impressions and views, thus briefly expressed, with but little time for a critical examination of all the au-thorities, I can see no grounds for a dissolution of this injunc-tion, which now prevents a multiplicity of suits and further litigation, until the highest court in our State shall finally ex-pound this law, and give us a guide for our steps and a lamp for our path. The continuance of the injunction can occasion no wrong to the respondent; its dissolution may subject the complainant to great inconvenience and loss. Higher con-siderations than mere individual rights or wrongs are, I think, involved in this case, and, in my judgment, the shortest and most satisfactory course should be now adopted, to have this law interpreted and the duties of the Inspector General of grain defined and performed on the one hand, and the rights and liabilities of a large and most respectable class of merchants

and farmers determined by the highest authority in the State. If I am wrong, therefore, in my present decision, the court of the last resort in this State, will soon be able to correct my error. I believe, however, I am right, and shall continue this injunction."

From the order overruling the motion to dissolve, and continuing the injunction, passed in accordance with this opinion, the defendant appealed.

The cause was argued before Le Grand, C. J., Eccleston, Tuck and Bartol, J.

*Milton Whitney* and *E. F. Chambers* for the appellant.

It is very desirable for the court to decide this case upon the construction of the act of Assembly. The farming interests of the State are in a high degree interested in the construction of this law, and this can be done without departing from the record, for if this construction be such, as we think it should be, it is one reason why the injunction should not have been granted or continued.

We maintain that by the true construction of the act of 1858, ch. 256, no change was made in the mode of weighing grain, and that therefore it was only required of the inspector to weigh one bushel in sixty.

The assumption, that wheat is sold exclusively by weight, is unauthorised. There is nothing but usage to require it in Baltimore, and it is not, in fact, the practice elsewhere in Maryland. There is no legislative provision in this State demanding it, and in the United States the revenue laws regulate the duties and compensation to measurers by the bushel, without determining it by weight, except only in the case of salt, in which each bushel is to be of fifty-six pounds weight. The fees on measuring grain and coal are charged by the bushel, irrespective of weight. Commissions for the sale of wheat, and all other grain, have always been charged by the running measure, whether above or below the weight of sixty pounds, in Baltimore and everywhere. This act of 1858 constantly associates the *measure* of wheat— "the bushel"

—with the weight.   The *second* section speaks of "inspection and measurement;" the *third* section has, "inspected, weighed and measured;" in each of which cases the language is obviously intended to apply to every description of grain, wheat as well as other kinds.   Again, in some instances, the words "weigh and inspect," without the word "measure," are applied to other descriptions of grain as well as wheat.   See section *sixth*, and also section *ten*, (in which the officer is not made to promise *to measure* any sort of grain,) and also section *twelve*.   Again, by section *twelve*, in returning his accounts, the inspector is to refer alone to the "bushel" to determine the amount of his work.

The appellee's counsel rely mainly on the language of the *fifth* section, "carefully weigh," &c., "all wheat."   Now the very connection in which these words are found is proof of the fallacy of the argument.   The inspector is to carefully weigh all wheat *that is inspected by him*.   The counsel have not, and could not, ask the court to say that this act required the inspector to inspect every bushel of wheat *seriatim*—nay, every peck and every pint—in a cargo.   But the duty is not fulfilled, say they, by weighing one bushel in sixty—one sixtieth part.   How then is the duty to inspect all wheat fulfilled by inspecting one sixtieth pound, or in any other way than by inspecting each several pound?   The inspector is just as imperatively required to inspect all wheat as to weigh it.   In making his return the inspector is only to give the number of "bushels," as well of wheat as of other grain.   The word "bushel" is here used in the same sentence, the same context, and, we say, in the same meaning in reference to wheat as well as to other grain, and must mean bushel by running measure, and not by weight.   It is an entire mistake to say that a new test of value was provided.   The proper application, by proper persons, of existing tests, were quite adequate to the purposes and intention of the law; and what that intention was, is as plain, we think, from the language of the act, as it is notorious to all the community from the known motives and objects of the individuals who framed it.

In respect then to this demand, literally, to weigh all wheat, it is, we say, perfectly gratified by the mode adopted; that the true meaning of these words is to weigh one bushel in sixty; that "measuring" grain is not better understood than "weighing wheat," and that the known meaning must be attributed to words in a statute. In a case before Chief Justice Taney, (cited below, and not denied by the counsel on the other side,) the word "wool," in an act of Congress, was held to include the bag in which it was contained, although not of woolen fabric, it being first proved that the practice so to regard it was universal. In 6 *Md. Rep.*, 49, cited by the appellee, the court say, evidence of usage may explain the terms of an agreement. The appellant does not claim to change the plain meaning of this act by usage—to defeat the plain meaning of its terms by usage. Just the reverse: we claim the exact meaning of the words of the act as well as its intention. The act says all wheat is to be weighed. It does not say *how*. Now what is the meaning of these words in the act, "weighing all wheat?" Are they such words as have had a meaning and import perfectly well known and understood by those in reference to whom they are used in this law? The affirmation of this fact is settled by the agreement filed.

Any contract to deliver a given number of bushels of wheat, each weighing sixty pounds, would be complied with, as far as the weight is concerned, by weighing one bushel in sixty. Hundreds, if not thousands, of such contracts have occurred, and no man has yet heard of an exception to this mode of "weighing all wheat." The universal usage has given a definition to these words. The very authority cited by the appellee, in 6 *Md. Rep.*, 49, proves the proposition here asserted. If a farmer sold a cargo of wheat by bushels of sixty pounds, as he always did in Baltimore, all that was done to ascertain the weight of the wheat—*all* the wheat—was to weigh one bushel in sixty. In the very case before the court, the appellee tells us he did determine the weight of the wheat "according to the old usage," that is, by weighing one bushel in sixty. He thus satisfactorily determined the weight of the wheat he purchased —the weight of *all* the wheat he purchased.

'That words in a statute are to be taken in their known and accepted sense, is regarded as an established, well settled canon of construction. 7 *G. & J.*, 61, *Medley vs. Williams.* The framers of this act knew what they were treating of, and what every one connected with this department of trade knew, the universally accepted meaning of these terms, and used them accordingly. In the case of *Love vs. Hinckley, Abb. Adm.*, 436, it was held, that "doubtful words in a general statute may be expounded with reference to a general usage, and when a statute is applicable to a particular place only, such words may be construed by usage at that place."

If an entire revolution in so important a branch of the commerce of the State, the most important interest it could touch, the whole trade in grain, had been in the view of the Legislature, if an entirely new, and hitherto unknown, system of conducting it had been designed, surely we should not be left without some more emphatic declaration of that design. It will be a small compliment to say they have left us so to conclude by the prefix of the word "all," in one section of the law, to the word "wheat"—the different interpretations of the words, "the wheat brought to market" and "all the wheat brought to market." The different modes of expression noticed above, and the indiscriminate application of terms will conclusively demonstrate the absence, instead of the presence, of such a purpose as the appellee ascribes to the words "all wheat," in the fifth section, and the alleged "carefully distinguished duties of the inspectors, in regard to wheat and other grain," supposed to be found in the *twelfth* section.

That we must ascertain the intent of the Legislature is an elementary canon of construction, but to arrive at this intent every part is to be considered, and the intention is to be extracted from the whole law and the subject matter to which it relates. 2 *Cranch*, 386, *Fisher vs. Blight.* 4 *G. & J.*, 152, *Canal Co. vs. Rail Road Co.* 14 *Pet.*, 178, *Brewer vs. Blougher.* Construing this act by these rules, we say, that the object of the law was to place between the buyer and seller of the wheat and other grain, an impartial officer of the law, with duties defined, and made responsible for their faith-

ful performance by a *bond* and an official *oath;* that the whole law evidently contemplates the same old time honored practice of estimating wheat, as well as other grain, by the use of the "bushel measure" and "scales," in the old mode by *"accurate* bushel measure," and "accurate" scales, under the supervision of sworn officers.

Any other construction of the law than that we have placed upon it, would render the whole law utterly inoperative, for it would be utterly *impossible* to weigh every bushel of wheat that is brought to the Baltimore market for sale, and the delay and expense attending such an attempt would be ruinous, oppressive and enormous, and in fact render the law wholly impracticable.

*John Nelson* and *Robert J. Brent* for the appellee:

This case involves two leading inquiries:

1st. What is the true construction of the act of 1858, ch. 256? What duties does it impose upon the appellant, and what obligations upon the appellee?

2nd. Assuming that the interpretation insisted on by the appellee is correct, and admitting, which is not denied, that the appellant refused to discharge his duty under said act, in accordance with such interpretation, had the court below authority, by injunction, to restrain the appellant from proceeding in his suit, instituted before the justice of the peace, to recover the penalty under the 15th section of said act?

The first question is to be determined by a consideration of the act itself, and by a careful collation of its several provisions. The object of the act is apparent. It designed to provide for the inspection, measuring and weighing, of the various descriptions of grain usually brought into the Baltimore market for sale. Of these wheat, is uniformly sold by weight, other grains by quantity or measurement. Inspection is common to both classes, and the mode is prescribed in the third section. The grain having been inspected, what is the further duty and authority of the Inspector General? In regard to this, the court will find his duty prescribed by sections five, ten and twelve. The court will perceive, that by the *first*

and *third* sections, the Inspector General is required to inspect all grain coming into the Baltimore market, and the mode of inspection is, in cases where lots of grain are mixed, which in cargoes of any extent is almost invariably the case, to take from the bulk *two average samples of each lot*. By the *fifth* section, he is required *carefully to weigh and determine the weight of all wheat that shall be inspected by him*, and, for that purpose, *shall procure suitable weights and scales*. Now, we think that, *all wheat* means *all* and not a *part*, and that the duty to weigh *all* is not fulfilled by weighing *one-sixtieth part* of the wheat inspected. And the *tenth* section justifies this interpretation, because it requires the inspector to swear, that he will *"diligently and carefully weigh and inspect all grain,"* &c. And the court will find, upon looking at the *twelfth* section, that the Legislature has carefully distinguished the duties incumbent on the inspectors, in regard to wheat and other grain. Thus, they are required to make a daily return, verified by affidavit, to the Inspector General, of the *number of bushels of grain* inspected by them, and the Inspector General is required to keep a record thereof, and to *charge and receive for the inspection and weighing of wheat*, one cent per bushel, and *one-half cent per bushel for all other grain;* and he is required to report to the comptroller, the number of bushels *of wheat weighed and inspected,* and the number *of bushels of other grain, inspected,* and he is to receive one-half cent for every bushel *of wheat weighed and inspected,* and one-quarter of a cent upon all *other grain inspected.*

It is thus clear, as we suppose, that the design of the act was to give to the merchant purchasing wheat, the advantage of the only true test of value, that of weight; and that in requiring the Inspector General, and his deputies, to weigh *all* wheat inspected by them, he is required to weigh every bushel, and not to weigh a part only, one-sixtieth it might be of various parcels of different values and weight, which frequently make up a cargo. And this would seem to be the conceded construction of the act, by the counsel for the appellant, since they seek to interpret it, by reference to a pre-existing usage, admitted to have existed in Baltimore before the passage of

this law.   It strikes us, however, that the Legislature, in the enactment of 1858, designed to correct the very usage relied upon, and that the purpose of the law can only have been, to substitute for this uncertain mode of ascertaining the weight and value of wheat, the precise and fixed rule to which we have already referred.   Besides, we suppose it to be clear, that no such usage can be interpolated into a law, the terms of which are definite, and susceptible of a satisfactory interpretation, upon its own provisions, the more especially, as the effect of such an interpolation would be, not only to add to and vary, but to change the entire system.   Since, if the usage is to control the law, *instead of ascertaining the quantity by weighing, the weight would be ascertained by measuring,* thus reversing the rule prescribed by the act.   The appellant would make this law operate merely to tax the community for his benefit.   Usage prior to a contract, may explain the meaning of the terms used in it, if it is so uniform and general, that parties are presumed to contract with reference to it, but even then it cannot change a plain term of the contract or a principle of law.   6 *Md. Rep.,* 49, *Foley & Woodside vs. Mason & Son.*   But usage, prior to a statute, can never be regarded in its construction, because, if designed to be the rule, the Legislature can incorporate it into the law.   There was no law upon this subject before the act of 1858 was passed, and the object of that act must have been to correct and reform fraudulent practices that were supposed to prevail, and take the whole subject under its control.   The statute must be construed by itself, and when it requires *all wheat to be weighed,* it would be absurd to make it read, that *only one-sixtieth part shall be weighed,* because, by usage among merchants in Baltimore, previously existing, only one-sixtieth part was weighed.   The only question in regard to usage has been, whether a statute can be interpreted by a long usage after and under it.   1 *Thos. Coke Litt.,* 44, *note a.*

If these views are well founded, it is clear, that the Inspector General, in refusing to weigh the wheat as required by the appellee, omitted to discharge his duty, was in default, and perpetrated an official wrong.   In this condition of things,

what was the appellee to do? Read the agreement of facts, and the correspondence, and the court will perceive, that the appellee had purchased the wheat in question, and that his own obligation as well as the necessities of trade and commerce, required that his contract should be executed. And the refusal to weigh by the agents appointed by law, and the necessity of some remedy to the parties who had a right to prosecute their trade, interposed an immunity for doing that which could in no other way be done. Suppose all the inspectors were dead, or no one could be induced to act as such, would the community be required to stop business? Did the Legislature ever contemplate that this law, or the officers appointed under it, should, at their will, supercede the activities of commerce, and arrest the trade of a great commercial community? or that the merchants were to be prosecuted and fined, for doing what was indispensable, to enable them to prosecute their lawful enterprises, because there were no public officers willing or ready to discharge their duties? This is the practical question, and the whole context of the law shows the legislative intention to have been, to punish the private weigher for doing that which was exclusively the privilege and duty of the public weigher, when there was a public weigher, prepared to execute the law agreeably to its provisions. *Holcombe's Digest, 587, 588. Coke Litt., 31.* If the public weigher were dead, or none appointed, the weighing by private individuals is allowed, by necessary implication, rather than ruin or arrest of the business of a whole community. If this be so, *a fortiori* must it be when the public weigher absolutely refuses to discharge his duty, and to weigh the wheat. If he had weighed it there would have been no necessity for the party to act, and if he had afterwards weighed the wheat for his own satisfaction, it would not have amounted to an offence, since it had already been weighed by the public officer. If the appellee has committed any offence, therefore, he has done so necessarily, because of official default of the appellant.

We unite with the counsel for the appellant, in requesting the court, in any event, to give a construction to this act, by

which means alone a vast amount of vexatious litigation can be avoided. Many other cases are already pending.

*Note.* The argument on the question of jurisdiction, on both sides, is omitted.

BARTOL, J., delivered the opinion of this court.

The question which gave rise to this controversy, involves the construction of the act of 1858, ch. 256, and inasmuch as that question has been fully argued, and the solicitors on both sides have united in expressing the wish, that the judgment of this court should be pronounced thereon, for the purpose of definitively settling other cases, now pending and awaiting the decision of this, we deem it unnecessary to pass upon the question of jurisdiction. For conceding that the Superior court had jurisdiction over the case, without however so deciding, it is admitted by the appellee, that if the construction of the act, claimed and insisted on by him, be erroneous, he is not entitled to the relief prayed in his bill of complaint, and the injunction granted by the Superior court must be dissolved. It appears from the record, that the complainant, with his partner in trade, on the 1st of July 1858, had contracted with a certain William S. Pawson for the purchase of a lot of wheat, represented by sample. The wheat was delivered at the warehouse of complainant, and the appellant, Frazier, the Inspector General of grain in and for Baltimore city, was notified that the same was ready to be measured and weighed. The appellant proposed to measure said wheat, and to ascertain its weight by weighing one bushel in every sixty, according to the long established usage in Baltimore. The complainant objected to that mode of weighing, and insisted, that the appellant was bound, under the law, to weigh the whole parcel, and upon the refusal of the appellant to adopt that construction of the law, the complainant proceeded to have the same measured and weighed, himself, and thereupon, proceedings were instituted against him before a justice of the peace, to recover the penalty under the 15th section of the act. Then, on application of the complainant, the Superior court, sitting in equity, issued an injunction to restrain the

proceeding before the justice of the peace, and from the order of said court refusing to dissolve the injunction, this appeal was taken.

It is admitted in the case, "that the practice of weighing wheat in the city of Baltimore, prior to the act of 1858, ch. 256, always has been, to weigh one bushel in sixty, as the index or mode of determining the weight between the buyer and seller; and that in this case the inspector was ready, and offered to weigh the wheat according to said practice, and that the inspector refused to weigh the wheat in any other mode, and has ever since refused to weigh wheat in any other mode; and that the complainant, in consequence of such refusal, and alleging that the law did require all the wheat to be weighed, proceeded to weigh the same, by weighing one bushel in every sixty, in order, as he alleged, to ascertain the true quantity of wheat in the lot, which he and his partner had purchased of said Pawson, and which lot being contracted for at a given price per bushel, and the number of bushels not being known at the time of the contract, the complainant weighed the wheat in manner aforesaid, and he and his said partner paid and settled for said lot of wheat, as of the quantity ascertained by such weighing of one bushel in every sixty, by the complainant as aforesaid."

Upon this state of facts, the question presented for our decision, is, whether the inspector, by measuring and weighing the wheat in the mode proposed by him, was fulfilling the requirements of the act of 1858? The principles which govern courts of justice in the construction of statutes, are simple and well defined. Among them the cardinal one is, that the intention of the Legislature shall be carried out. That intention is to be collected from the words of the statute, by considering every part of it. 2 *Cranch.*, 386.

It may also be ascertained, by considering "the cause or necessity of making the act, or from foreign circumstances." 4 *G. & J.*, 152.

Guided by these rules, we have but little difficulty in coming to a conclusion, upon the proper construction of the act of 1858, and ascertaining the true intent of the Legislature in

passing it. The object and general purpose of the law was, to provide a competent and suitable officer, to inspect grain sold in the city of Baltimore, and to ascertain, with fairness and accuracy, the true quantity sold by weighing and measuring; to establish a system by which the Legislature supposed the former would more honestly receive, and the merchant more honestly pay, exactly for what is sold and bought. The act proposes to accomplish this result, not by introducing a new mode of weighing and measuring, but (to use the language of the judge of the Superior court) by placing "between the buyer and seller, an impartial officer of the law, with duties defined, and their faithful performance secured by a bond and an oath."

Great stress has been laid, by the appellee, upon the language of the 5th section. It is in these words: "That the said inspectors shall also carefully weigh and determine the weight of all wheat that shall be inspected by them, or carried to the said city for sale, and for that purpose shall procure, at reasonable and proper cost, suitable weights and scales to effect the purpose herein contemplated."

It is said, that the weight of a lot of wheat cannot be ascertained, without weighing all and every part of it. "*That all means all, and nothing less.*" This view of the case would confine us to the words of the 5th section alone; our duty is to look at the whole act, and to construe it by considering all its provisions.

"The office of a good expositor of an act of Parliament, is, to make construction on all the parts together, and not of one part only by itself; *nemo enim aliquam partem recte intelligere possit, antequam totum iterum atque iterum perlegerit.*" 3 *Coke Rep.*, 59.

The act requires that *all* shall be inspected; yet it is obvious by the words of the 3rd section, that the Legislature designed, that by the inspection of two fair average samples from any lot, the quality of the whole lot should be determined. Why not then ascertain the weight of the lot, by weighing a fair average portion of it and measuring the whole? If the whole is to be weighed to determine the quantity, why require it to

Frazier *vs.* Warfield.

be measured at all? If the construction of the appellee is correct, measuring would be useless; yet the act, throughout, constantly associates the measure of wheat, "the bushel" with the weight. The Legislature requires the quantity to be ascertained by *weighing* and *measuring*. What is meant by these words as used in the act of Assembly? Now, looking at the admitted facts in this case, it seems to us that the terms, *weighing* and measuring wheat in the city of Baltimore, have obtained a certain and definite meaning; if so, that meaning must be given to the words of the statute.

"It is a familiar rule, that words in a statute shall be taken in their accepted and known sense." *Medley vs. Williams,* 7 *G. & J.,* 71.

Again, it is admitted that an immemorial usage has existed in Baltimore, by which the weight of a lot of wheat, as between buyer and seller, has always been ascertained by weighing one bushel in sixty. If the meaning of the words of the act be uncertain, the law authorises us to resort to the usage for their interpretation.

"Doubtful words, in a general statute, may be expounded with reference to a general usage, and when a statute is applicable to a particular place only, such words may be construed by usage at that place." *Love vs. Hinckley, Abb. Adm.,* 436.

This rule is founded in reason and common sense, and is peculiarly applicable to the case before us. The Legislature must be presumed to have acted with a knowledge of the usage existing in Baltimore, and if it had been their purpose to inaugurate a new mode of weighing, they would have declared their intention in plain and unequivocal terms.

We think there is great force in the argument, based on the inconvenience that would result from adopting the construction claimed in this case by the appellee. When we consider the immense quantity of wheat which finds a market in the great commercial mart of our State, it is perfectly obvious, that it is almost, if not entirely, impracticable, to weigh every bushel. To give such a construction to the act, would be to subject the community to the greatest inconvenience, expose

the parties interested to enormous expense and delay, and entirely frustrate the whole objects of the law.

Chief Justice Marshall, in the case of *Fisher vs. Blight,* 2 *Cranch,* 386, said: "It is also true, that where great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the Legislature be plain, in which case it must be obeyed."

No sound rule of construction can authorize us, to impute to the Legislature a purpose in passing the act of 1858, which would entail such mischievous consequences as we have described, or make the statute nugatory.

Whatever may be the differences of opinion with regard to the policy or expediency of the law, our duty in administering it is, to give effect to the legislative will, fairly ascertained and interpreted, according to established rules of construction.

We are of opinion that the order of the Superior court, from which this appeal was taken, ought to be reversed, and the bill dismissed, and will sign a decree accordingly.

*Order reversed and bill dismissed,*

*with costs to appellant.*