# PRINCE GEORGE'S COUNTY, MARYLAND
## v. BEARD ET AL.

[No. 380, September Term, 1971.]

*Decided June 13, 1972.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and DULANY FOSTER, Chief Judge of the Supreme Bench of Baltimore City, specially assigned.

*Carl Harrison Lehmann,* with whom were *Walter H. Maloney, Jr., County Attorney,* and *Glenn B. Harten, Assistant County Attorney,* on the brief, for appellant.

*Charles J. Steele,* with whom were *Jo V. Morgan, Jr.,* and *Harry L. Ryan, Jr.,* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

In *City of Bowie v. County Comm'rs,* 260 Md. 116, 117, 271 A. 2d 657 (1970), Judge McWilliams said for the Court:

> "We shall be concerned here with another skirmish, perhaps the last, in the revolt of the appellants (Bowie) against the proposed Prince George's County airport."

He may have been unduly optimistic. The parties have changed somewhat and a central part of this opinion will deal with a possible change in the use to be made, but the skirmishing in the area goes on, seemingly without end.

Appellant, Prince George's County, Maryland (the County), filed a petition to condemn land owned by the appellees. Paragraph eight of the original petition recited "[t]hat the [County] ha[d] determined that the

property [was] needed and [would] be used for the construction and/or reconstruction of a public Airpark, and that such Airpark is a public purpose." The condemnation action was instituted pursuant to a directive of the County Commissioners of Prince George's County, but after the effective date of the Prince George's County Charter (the Charter).

Chapter 689 of the Acts of 1968 authorized the County to borrow $8,300,000 after first "adopt[ing] a resolution describing the public airport facilities and industrial parks for which said borrowing or indebtedness [was] intended." Section 1 (b) of the Act stated:

> "(b) the term 'industrial parks' shall mean
> (i) the acquisition, by any legal means, of land or property in Prince George's County generally in the southwest quadrant of the intersection of Maryland Route 214 and U. S. Route 301 in one contiguous tract as now determined by the County to be suitable as the site or sites for the establishment of one or more industrial parks to encourage and promote the creation of new industry and the growth of existing industry in Prince George's County and (ii) the grading of such site or sites, the construction of access roads, rail service tracks and taxiways, the construction and equipment of buildings the construction and installation of all utility services and the doing of any and all things necessary in connection with or pertaining to the acquisition and development of such land or property as industrial sites including but not limited to the architectural and engineering services incident thereto."

The bond issue was the subject of an earlier skirmish in *City of Bowie v. County Comm'rs*, 258 Md. 454, 267 A. 2d 172 (1970).

The battle continued and the General Assembly by Chapter 6 of the Acts of 1971, adopted as an emergency

law and signed by the Governor on March 30, 1971, repealed and re-enacted § 1 (a) of Chapter 689. It provided that the location of the proposed airport rather than being "generally in the southwest quadrant of the intersection of Maryland Route 214 and U.S. Route 301 or relating thereto," should "be located at any other site within Prince George's County provided adequate safeguards ha[d] been provided to limit the noise, safety and nuisance hazards imposed on the residents of the immediate area by such a facility or relating thereto and the impact of the project on the local environment."

The trial judge in this case stated in his opinion that he sat in the case of *Prince George's County v. Caulfield,* Law No. 47,351, in the Circuit Court for Prince George's County, where "[t]he validity of Chapter 6 was questioned * * * and it was held to be a nullity for the reason, that the Charter had previously been adopted in Prince George's County and local legislation was then entirely within the province of the County Council rather than the General Assembly of Maryland." No appeal was taken from that decision.

On June 17, 1971, the County Executive issued executive order "No. 72-1971" addressed to the county attorney in which he recited that the County Commissioners of Prince George's County on November 27, 1970, ordered that subject property be condemned, that they appropriated funds for the acquisition of the property "by General Resolution No. 1-1971, dated January 26, 1971," that they "determined that [subject] property [was] necessary for the construction, reconstruction and/or maintenance of a public airpark facility and/or industrial park," that the County had been unable to negotiate purchase of said property, that "it [was] determined to be necessary that said property be condemned for said public purpose and necessity in order that said public airpark facility and/or industrial park be constructed, reconstructed or maintained," and directed the county attorney "to institute proceedings and/or amend any pending proceedings to acquire the [subject] property

by condemnation." Pursuant to that order and an order of court granting leave, the condemnation petition was amended. Paragraph 8 of the amended petition stated:

"That the Petitioner has determined that the property is needed and will be used for the construction and/or reconstruction of a public airport facility and/or industrial park, and that such public airport facility and/or industrial park is a public purpose."

Skirmishing continued. The County Council passed Bill 19-1971 in September which became effective November 7, 1971, the County Executive having neither signed nor vetoed the bill within 10 days after its presentation. That bill revoked the authority to proceed under the provisions of Chapter 689 of the Acts of 1968, declared land acquired for the purposes set forth in that act to be surplus property, directed the County Executive "to sell the land at public or private sale as expeditiously as is feasible," and specified the disposition to be made of the funds thus acquired.

Yet another executive order was issued on September 21, 1971, after passage of Bill 19-1971. It directed the county attorney "to proceed with the pending condemnation cases brought pursuant to the authority conferred upon the County in Chapter 689, Acts, 1968, exclusively for the industrial park purpose permitted in that Act," and to "[a]mend, where necessary, any pleadings in any pending cases to reflect [that] instruction." It stated that "[a] plan for the utilization of the property in question exclusively for an industrial park, without the airpark feature, [would] be prepared and forwarded to the Office of Law for use in the pending cases, if it [became] necessary to present such a plan to the Court." Upon the strength of that order the county attorney moved "to amend paragraphs 2 and 9 of its Petition to conform to said Executive Order," paragraph 2 being where the authority for condemnation was recited.

Appellees moved to dismiss the condemnation proceed-

ings on the ground that authority no longer existed for condemnation and also because the proposed amended petition was "unconstitutionally impermissible on its face as an attempt to acquire private property for a purely private purpose in violation of the constitution and laws of the United States and the State of Maryland."

The matter ultimately came on for hearing before Chief Judge Powers. The concluding paragraph of his opinion read:

> "It is not necessary to decide whether land for this project may be purchased by the County but only the question posed in this case: whether the County has the power to condemn. Whatever the fiscal consequences and the interpretation of the effect of Sections 818 and 824 may be under other circumstances, I must conclude that the clear intent of the Council to abandon the public airport and industrial park project by the enactment of Bill No. 19-1971 cannot be circumvented by any interpretation of these sections or an Executive Order. The original legislation declared this project to be for public purposes. Subsequent legislation declared the project abandoned and the land acquired surplus property. There is no legal authority by which the acquisition of additional land by condemnation can meet the requirement that it be for public use. The motion to dismiss will be granted."

There are two questions posed to us by the County: (1) whether the enabling legislation was effectively repealed and the project effectively abandoned by the County Council Bill 19-1971, and (2) whether the County has "the power to condemn private property for a publicly owned and operated industrial park leased, in major part, to private industrial and commercial interests." The appellees see the second point as the all important one which will dispose of the entire matter, they hope,

so they addressed themselves first to that point. We shall remand the case without affirmance or reversal under Maryland Rule 871 a for further proceedings since on the record before us we are unable to effectively answer either question.

## I

The County in its brief states:

"While this capital project did not originally stem from inclusion in a capital budget, its continuation and present operativeness is recognized and contained in the Capital Budget enacted by the Council under the Charter on June 15, 1971."

This point is not disputed by the appellees in their brief, but no confirmation for it is found in the record extract.

The County points out that § 818 of the Charter provides in pertinent part:

"Interproject transfers of appropriations between *capital projects in the capital budget* may be authorized by legislative act of the Council upon *request of the County Executive,* but no new project shall be created *nor any abandoned* except in accordance with section 824 of this Charter." (Emphasis added by the County.)

It further notes that § 824 states:

"No obligations of the County shall be authorized in any fiscal year for or on account of any capital project not included in the County budget as finally adopted for such year; provided *that upon receipt of a recommendation in writing from the County* Executive, the Council may, after public hearing and with the affirmative vote of two-thirds of its members, amend the County budget in accordance *with such recommendation* without increasing the total

amount of appropriations therefor." (Emphasis added by the County.)

These sections under the Charter became operative on February 8, 1971, when the County Executive and County Council took office.

Article VIII of the Charter is concerned with budget and finance. Section 804 defines the terms there used. Subsection (c) defines the term "capital project" as including "the acquisition of property of a permanent nature for public use" and "any physical public betterment or improvement and any preliminary studies and surveys relative thereto." The term "capital budget" is defined in subsection (d) as "the plan of the County to receive and expend funds for capital projects during the first fiscal year included in the capital program," while "capital program" is said in subsection (e) to be "the plan of the County to receive and expend funds for capital projects during the fiscal year covered by the capital budget and the next succeeding five fiscal years thereafter."

The County makes note of the fact that provisions similar to §§ 818 and 824 are contained in the charters of Baltimore City, Baltimore County, and Anne Arundel County, and that an identical provision is found in the Howard County Charter. The reporter's note to § 716 of the Anne Arundel County Charter relative to restriction on capital projects and amendment of capital budget after adoption of the budget states:

> "The Charter Board believed that, since most of the funds for capital projects are derived from the sale of bonds, all the capital projects for any given fiscal year should be firmly fixed at one particular time. However, the Board also recognized the necessity of providing authority so that changes can be made to meet some unexpected problem. Therefore, the capital budget may be amended by providing that funds may be appropriated for a new project and bonds

sold to cover the cost thereof, if the Executive, the Planning Advisory Board and the County Council agree that this should be done."

The Charter in § 811 provides for transmission of the capital budget to the County Council by the County Executive. It then states in § 814:

"After the public budget hearing, the Council may not add new items but may increase, decrease, or delete any items in the budget except those required by the laws of this State or of this County * * *. The Council shall have no power to change the form of the budget as submitted by the Executive * * *."

It must be assumed that the citizens of Prince George's County meant what they said in the language placed in the Charter and in the consequent allocation of powers between the executive and legislative branches. The oft quoted statement in *Thomas v. Police Commissioner*, 211 Md. 357, 127 A. 2d 625 (1956):

"It is a hornbook rule of statutory construction that, in ascertaining the intention of the Legislature, all parts of a statute are to be read together to find the intention as to any one part and that all parts are to be reconciled and harmonized if possible." (Citing authorities.) *Id.* at 361.

is no less true of a county charter. To us it is plain that the people of Prince George's County ordained in their Charter that a capital project included in a capital budget can only be abandoned under § 824 which requires "a recommendation in writing from the County Executive," public hearing by the Council, and a then "affirmative vote of two-thirds of its members" for such abandonment. A project could not be abandoned solely by action of the County Council. If this project was in fact in the capital budget approved by the County Council,

then Bill 19-1971 is as much a nullity as Chapter 6, Acts of 1971.

Since it does not appear from the record whether this project was or was not included in the capital budget adopted by the County Council as stated by the County, that fact will be ascertained upon the remand. We do not address ourselves to the other point raised by the County as to why the action of the Council in Bill No. 19 is improper since this one point would be dispositive of the matter.

## II

As will be seen from the two versions of paragraph 8 of the condemnation petition we have quoted and the third version in the proposed amendment, the contemplated use of the land in question has been stated with something less than mathematical precision. The appellees point to the deposition of County Executive Gullett taken on October 20, 1971, where it is stated:

> "Q. Under the present plans, will all of the land in this project be sold to private parties? A. I couldn't really say. I think that is one of the intents of the legislation, the original legislation, to sell it to private parties after it is all acquired as one body and properly planned. That would be one of the intents.
>
> "Q. For what purpose? How specific are the plans at this point as to what purpose you want it sold? A. The plans, unfortunately, have to become a little less specific, because to eliminate the air-park portion of it—this was a large runway—it would really call for a re-thinking, a re-planning of the area.
>
> "I am going to proceed to get a new master plan prepared for the area as an industrial park. In that way we can have the proper planning done without the airstrip portion of it being there.
>
> "That is what I want to do now.

"Q. Have any steps been taken to date as far as acquiring a new master plan? That is, have planners been contacted? A. Yes. We contacted the firm that did some of the original work and asked them to come back with a master plan that would entail or be the best recommendation that they would have regarding that as purely an industrial park, rather than 'air and industrial.'

"Q. I gather they have not yet made this. A. No. They have not come back with the report yet. I would hope to get something in the not too distant future.

"Q. Would it be fair to say at this point that you really can't tell us what type of activity will take place on that land? A. I think I can certainly say that it will be very similar to what was envisioned previously, an industrial park, with the accentuated air-park portion of it eliminated.

"For instance, there would probably not be an air school there—training, ground training of an aeronautical nature—probably not, because the airstrip would not be there.

"The AOPA probably wouldn't be interested in that—that is, the Airlines Operators and Pilots Association. They wouldn't be interested in locating their offices there, although the offices were commercial. Without the airstrip there, they probably wouldn't be interested in coming there.

"I am sure that many of the industries, some types of industries, that would have located there still would be interested in being there.

"Q. What types of industries are they? A. We are thinking of generally clean, industrial industry—such as electronic, light-manufacturing types of industry, that would use the good

access to Route 3, Central Avenue, the railroad, closeness to National Airport, the Baltimore ports, Friendship Airport, this type of thing.

"Q. In addition to light industry, does it envision commercial office buildings? A. I think so. I think a commercial office building would fit in very nicely. That was also envisioned, that there would be a commercial office building there, maybe even, perhaps, a motel type of operation.

"Q. Have there been contacts made with you or with the government by firms since the abandonment of the airport saying, 'We are still interested. How do things stand? We would still like to come in'? A. No. I have had no contact one way or another, at least not directly with me. There may have been with my Economic Development Department."

Appellees contend that what is here contemplated is a taking for private use prohibited by Art. III, § 40, of the Maryland Constitution. That section provides:

"The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

It came into the Constitution as § 46 of Art. III of the Constitution of 1851 and was adopted in like form in the Constitution of 1864. *See Constitutional Revision Study Documents* (1968) at 810-11.

In *Arnsperger v. Crawford*, 101 Md. 247, 61 A. 413 (1905), Judge Pearce said for the Court:

"There is no prohibition in express terms against taking private property for private use, to be found either in our Constitution or Declaration of Rights, nor can it be justly held that

any is needed, although such a prohibition is contained in the Constitutions of Alabama, Colorado, Georgia, Louisiana, and Missouri. The implied prohibition contained in sec. 40 of Art. 3, is too clear to be questioned." *Id.* at 251.

This provision, as Judge (later Chief Judge) Alvey put it in *New Central Coal Co. v. George's Creek Co.*, 37 Md. 537, 559 (1873), "is but declaratory of the previously existing universal law, which forbids the arbitrary and compulsory appropriation of one man's property to the mere private use of another, even though compensation be tendered." He then went on to say:

> "For, as was very justly said by the Supreme Court of the United States, that government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expression of the will of the people. *Wilkinson v. Leland*, 2 Pet. 657." *Id.* at 559-60.

Whether the use for which private property is taken is public or private, within the meaning of this Maryland constitutional provision, is a judicial question to be determined by the courts. *Perellis v. M. & C.C. of Balto.*, 190 Md. 86, 93, 57 A. 2d 341 (1948) ; *Pitznogle v. Western Md. R.R.*, 119 Md. 673, 679, 87 A. 917 (1913) ; and *Van Witsen et al. v. Gutman*, 79 Md. 405, 410, 29 A. 608 (1894). To like effect *see* 11 McQuillin, *Municipal Corporations* § 32.39b (3d ed. (rev.) Ellard 1964). A

legislative body can not make a particular use either public or private merely by so declaring it, *Arnsperger v. Crawford, supra,* for if it could do so the constitutional restraint would be utterly nugatory. *New Central Coal Co. v. George's Creek Co., supra.*

Maryland Rule U6 requires that there be in the petition for condemnation "[a] statement of the purposes for which the property is sought to be condemned." This is but a restatement of the requirement spelled out in Code (1957) Art. 33A, § 1 prior to the 1963 revision of the law on eminent domain. The reason for this is plain. Without such a statement courts and litigants would not be able to determine whether a condemnation was proposed for a public purpose.

No useful purpose would be served by a review of what this Court, other courts, or the text writers have regarded as constitutionally permissible public usages. Inevitably, inferences would be drawn from such comment as to whether we might or might not regard a proposed industrial park as constitutionally permissible when in fact we could make no such determination until full and complete facts were before us. The County is proposing condemnation when the record before us shows that even the County Executive is unable to say what use will be made of the property. For us to hold on such a record that a public use has been established would be to hold, in essence, that a public body may condemn private property for any purpose which suits its convenience which, to paraphrase Judge Alvey's comment in *New Central Coal Co.,* would make the rights of property solely dependent upon the will of a legislative body, without restraint. Such is not the law.

Upon the remand the County will have full opportunity to spell out the use it proposes making of the property and all the details surrounding that use. In upholding condemnation for the purpose of constructing port facilities, a use that seems to be widely permitted, our predecessors in *Marchant v. Baltimore,* 146 Md. 513, 521, 126 A. 884 (1924), spoke of the fact that the construc-

tion was "according to a comprehensive plan, by which the commerce of the port [would] be most advantageously served, and its future growth encouraged." In order for a court to perform its judicial function in this type of case the plan should indeed be comprehensive. A number of months have now passed since the County Executive's deposition was taken. No doubt by this time the County's plans are more definite than they were last October and when presented will furnish a solid basis for a judicial determination as to whether they are constitutionally permissible.

*Remanded for further proceedings without affirmance or reversal; appellant to pay the costs.*