# MASS TRANSIT ADMINISTRATION *v.* BALTIMORE COUNTY REVENUE AUTHORITY ET AL.

[No. 143, September Term, 1972.]

*Decided January 11, 1973.*

688

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Joseph S. Kaufman* for appellant.

*R. Taylor McLean,* with whom were *Margaret P. Mahoney* and *Royston, Mueller, Thomas & McLean* on the brief, for Baltimore County Revenue Authority, part of appellees, and *Southey F. Miles, Jr.,* on the brief, for The Equitable Trust Company, Trustee, other appellee.

MURPHY, C. J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court for Baltimore County (MacDaniel, J.), dated June 13, 1972, declaring that the Mass Transit Administration (MTA), formerly the Metropolitan Transit Authority, is required to pay the tolls charged by the Baltimore County Revenue Authority (Revenue Authority) for the use by the MTA buses of two bridges owned by the Revenue Authority, spanning the Bear Creek in Baltimore County.

The Revenue Authority was created a public body corporate and an instrumentality of Baltimore County by the General Assembly of Maryland by its enactment of Chapter 126 of the Acts of 1955, now codified as Title 29, §§ 29-1 to 29-18 of the Baltimore County Code (1968 Ed.). The Act empowered the Revenue Authority, among other things, to acquire, construct, and operate toll bridges; to fix, charge, and collect tolls for the use of any such facility at reasonable rates; to borrow money and issue negotiable revenue bonds; and to secure the payment of such bonds by pledge or indenture of trust of all or any part of its revenues. These powers were secured

by the further provision, contained in § 29-11, that the State

". . . does hereby pledge to and agree with any person . . . subscribing to or acquiring the revenue bonds to be issued by the authority for the construction, extension, improvement, equipping, furnishing or enlargement of any project or part thereof, that the state will not limit or alter the rights hereby vested in the authority until all such bonds at any time issued to provide funds for such project or part thereof, together with the interest thereon, are fully met and discharged, it being the intent of this title that the authority shall continue to have and may exercise all powers herein granted, so long as the same shall be necessary or desirable for the carrying out of the purposes of this title."

In 1958, pursuant to the authority vested in it, the Revenue Authority authorized the sale of $5,400,000 of its revenue bonds and entered into an Indenture of Trust with the Equitable Trust Company to protect and enforce the rights and remedies of the bondholders. The Indenture directed that the bond proceeds were to be used to the extent of $946,200 (together with other funds available to the Revenue Authority) toward the refunding of bonds issued by the Revenue Authority in February, 1957, for the purchase and repair of Bear Creek Bridge I, and the remaining proceeds to be used for the cost of constructing, erecting and maintaining proposed Bear Creek Bridge II. The Indenture provided that ". . . the Authority has pledged and does hereby pledge to the Trustee the tolls and other revenues of Bear Creek Bridge I and Bear Creek Bridge II to the extent provided in this Indenture as security for the payment of the bonds and the interest thereon . . . ." § 502 of the Indenture provided:

"The Authority covenants . . . that no free vehicular passage will be permitted on Bear

Creek Bridge I or the bridge constituting a part of Bear Creek Bridge II except to officials or employees of the Authority and of the executive and administrative departments of Baltimore County, official vehicles of the police and fire departments of said County, and of the State Police of Maryland."

Subsequent to the execution of the Indenture, the Revenue Authority sold its bonds in the amount of $5,400,-000; with the proceeds it financed the acquisition, construction and maintenance of the two Bear Creek bridges. Thereafter the Revenue Authority charged tolls to all users of the bridges except those specifically exempted under § 502 of the Indenture agreement.

The Metropolitan Transit Authority, a body corporate and an instrumentality of the State of Maryland, was empowered by the provisions of Maryland Code (1957, 1972 Repl. Vol.), Article 64B, to provide improved and expanded transit facilities and service in the Metropolitan Transit District, comprising the territory lying in the boundaries of the City of Baltimore, and the Counties of Baltimore and Anne Arundel. Its buses regularly utilized the two Bear Creek bridges, and it paid the toll of thirty cents per bus per crossing charged by the Revenue Authority until January 1971 when, on advice of counsel, it discontinued paying the tolls, claiming exemption under Article 64B, § 48. That section, as it then stood, read as follows:

"It is hereby declared that the creation of the [Metropolitan Transit] Authority and the carrying out of the corporate purposes of the Authority is in all respects for the benefit of the people of the State and of the District and is for a public purpose and that the Authority and the board will be performing an essential governmental function. Accordingly, any and all real and personal property (both tangible

and intangible) and any and all right, title and interest therein, gross receipts, gross or net income, purchases, sales, franchises, licenses, operations, activities and functions, owned or controlled, or received, or made, or performed or carried on, by the Authority shall be and remain totally exempt from *any and all taxes, assessments, charges and fees of every kind,* now or hereafter in effect, imposed, levied or made by the State of Maryland or any political subdivision, or any agency or instrumentality of any of them." (Emphasis added.)

§ 48 was amended by Chapter 526 of the Acts of 1970, approved May 5, 1970, to become effective July 1, 1971; as amended, the exemption contained in the section was changed from that above italicized to one exempting the Metropolitan Transit Authority from "any and all ordinary or special taxes, assessments, and charges except water and sewer charges . . . ." In April 1971, the Revenue Authority advised the Metropolitan Transit Authority that it was not exempt under Article 64B, § 48 from paying the toll charges; that even if that section did purport to grant an exemption from the payment of such charges, it would be invalid in view of the earlier provisions of § 29-11 of the Baltimore County Code (*supra*) whereby the State "formally agreed not to limit or alter the obligation of the Revenue Authority"; and that, consequently, "any interference with the vested rights of the bondholders would be a violation of the United States Constitution."

In May 1971, the Metropolitan Transit Authority (later renamed Mass Transit Administration) filed its Bill of Complaint for Declaratory Relief claiming exemption from payment of the tolls by reason of the provisions of Article 64B, § 48. At the trial, evidence was adduced showing that the tolls charged the MTA buses averaged $1900 per month in 1970; that the Revenue Authority billed the MTA $14,608.50 for the period May

through December 1970 and was paid in full; that the MTA made no payment for toll charges billed to it from January 1971 to October 1971; that as of the time of trial, the unpaid charges amounted to $18,132; that in prior years, revenues received by the Revenue Authority were sufficient to cover the debt service, but that projected revenues for fiscal 1972, assuming full payment of toll charges incurred by the MTA, were $32,200 short of projected expenses and debt service; that of the original issue of $5,400,000, the amount of $3,490,000 remained outstanding; that the Trustee allows the Revenue Authority no latitude in granting toll exemptions but instead requires complete compliance with the Indenture provisions for the protection of the bondholders; and that the only toll exemptions permitted were those expressly set forth in the Indenture, *viz.,* bridge vehicles, bridge employees, Baltimore County Police Department, Maryland State Police Department, Sparrows Point Fire Department and ambulance service, Baltimore County Fire Department, Bureau of Highways and one named sheriff. The importance of the toll exemption provision was testified to by J. Creighton Riepe, an investment banker of forty years experience in municipal bonds. He said:

> "Revenue bonds are payable out of revenues and they are, in almost all cases, secured by a trust indenture, and that trust indenture would have certain provisions, such as this provision that is under discussion here, this question of who can have free passage or under what conditions free passage could be had over a facility. Those things must be in the trust indenture or the resolution so as to protect the bondholder. Without them I don't think the bonds would be marketable."

Riepe further testified that the bonds would not be marketable if it were permissible to alter the rights of

the bondholders after the sale of the bonds had been consummated.

MTA argued at trial that since it was performing a governmental function and public purpose it should be included within the ambit of the exemption provided by § 502 of the Trust Indenture. In the alternative, the MTA maintained that Article 64B, § 48 exempted it from the payment of tolls; that such an exemption would not impair the obligation of the contracts, but even if it did, the exemption was still valid as a proper exercise of the police power of the State. The Revenue Authority, on the other hand, reasserted its position that the MTA was not exempt under either § 502 of the Trust Indenture or Article 64B, § 48. It maintained that if Article 64B, § 48 were construed to create such an exemption it would constitute an unconstitutional and void impairment of the obligation of its contracts with the bondholders and the Trustee.

Judge MacDaniel, in an incisive analysis, resolved the case into four issues, deciding: (1) that the MTA was not within the exemption from bridge toll payments under § 502 of the Indenture of Trust; (2) that the MTA was exempt from bridge toll payments under the provisions of Article 64B, § 48; (3) that the § 48 exemption constituted an impairment of the obligation of the contracts between the Revenue Authority, the Trustee and the bondholders in violation of Article 1, § 10 of the United States Constitution; and (4) that the unconstitutional exemption granted by § 48 could not be justified as a proper exercise of the police power of the State.

We think Judge MacDaniel was right in rejecting MTA's argument that it was within the exemption granted by § 502 of the Indenture of Trust. The wording of that section plainly shows that it does not contain the "broad governmental exemption" claimed by the MTA, but instead is an exemption limited to specified Baltimore County officials and official vehicles, and official vehicles of the State Police of Maryland. MTA is simply not in-

cluded within the exemption and can therefore derive no benefit from it.

With respect to the question whether Article 64B, § 48 exempted the MTA from payment of the tolls, Judge MacDaniel framed the issue in these terms:

> "Does the exemption from the payment of 'any and all "charges" now or hereinafter in effect, imposed, levied or made by the State of Maryland, or any political subdivision, or any agency or instrumentality of any of them' granted the M.T.A., by virtue of Section 48 of Article 64B, include an exemption from paying tolls?"

Judge MacDaniel recognized that resolution of the issue involved interpretation of Article 64B, § 48, both in its original ("any and all taxes, assessments, charges and fees of every kind") and amended forms ("any and all ordinary or special taxes, assessments, and charges except water and sewer charges") for the tolls alleged to be due accrued for a period of six months before the effective date of the amendment to § 48, and thereafter under the section, as amended. The Revenue Authority's argument that a definite distinction exists between a toll and a tax was accepted by Judge MacDaniel on authority of *Sands v. Manistee River Improvement Co.*, 123 U. S. 288, 8 S. Ct. 113, 31 L. Ed. 149 (1887), a case in which the Supreme Court noted:

> "There is no analogy between the imposition of taxes and the levying of tolls for improvement of highways; and any attempt to justify or condemn proceedings in the one case, by reference to those in the other, must be misleading. Taxes are levied for the support of government, and their amount is regulated by its necessities. Tolls are the compensation for the use of another's property, or of improvements made by him; and their amount is determined by the cost

of the property, or of the improvements, and considerations of the return which such values or expenditures should yield." 123 U. S. at 294, 8 S. Ct. at 115, 31 L. Ed. at 151.[1]

But without regard to the existing distinction between a tax and a toll, Judge MacDaniel concluded that it was the legislative intent that the term "charges," as used in § 48, exempted the MTA from the payment of bridge tolls. In so concluding, we think Judge MacDaniel was in error.

The Revenue Authority and the MTA each cite various dictionary and case law definitions of the word "charges" in an attempt to demonstrate the intent of the Legislature in enacting Article 64B, § 48. None of them, however, can be properly applied *in vacuo*. It is the first rule of statutory construction that the intent of the General Assembly is to be determined from the purpose and language of the enactment. *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 252 A. 2d 242 (1969) ; *Walker v. Montgomery County Council*, 244 Md. 98, 223 A. 2d 181 (1966) ; *Truitt v. Board of Public Works*, 243 Md. 375, 221 A. 2d 370 (1966). The Legislature plainly expressed its purpose in enacting § 48 when, in the title to Chapter 160 of the Acts of 1969, in referring to the section, it specified that it was intended

> ". . . to exempt . . . the property, activities and income of the [Metropolitan Transit] Authority from taxation by the State of Maryland and the political subdivisions thereof . . . ."

The heading appended to § 48 by the Legislature (not the codifier) was: "Tax exemption." That the title of an act

---

1. See also Day v. City of St. Augustine, 104 Fla. 261, 273, 139 So. 880, 885 (1932):
   "A toll is a demand quite different from a special assessment imposed for benefits. The latter is in the nature of a *tax*, and is often called a *tax*. A toll, on the other hand, has been defined as a common charge which it is the prerogative of sovereignty alone to impose and regulate and which cannot be exercised at all without a *franchise* from the state." (emphasis in original)
And see, Annot., 167 A.L.R. 1356 (1947).

is relevant to ascertainment of its intent and purpose is well settled. *Truitt v. Board of Public Works, supra; Central Credit Union v. Comptroller,* 243 Md. 175, 220 A. 2d 568 (1966) ; *Shub v. Simpson,* 196 Md. 177, 76 A. 2d 332 (1950) ; *Eisler v. Eastern States Corp.,* 186 Md. 251, 46 A. 2d 630 (1946). In view of the requirement of the Maryland Constitution, Article III, § 29—that every law enacted by the General Assembly embrace but one subject and that shall be described in its title—to expand the use of the word "charges" to embrace tolls, which clearly are neither taxes nor charges in the nature of taxes, is to fail to conform the substance of the statute with its title description and, consequently, to suggest unconstitutionality to the extent of the conflict. *See Buck Glass Co. v. Gordy,* 170 Md. 685, 185 A. 886 (1936) ; *State v. Blanken,* 11 Md. App. 460, 275 A. 2d 179 (1971). Were there any doubt of the legislative intent to create a tax exemption, or an exemption from governmental levies in the nature of taxes, and nothing more, we think it dissipated by application of the rule of *ejusdem generis, i.e.,*

> "Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2 Sutherland, *Statutory Construction,* § 4909 (3rd Ed. 1943).

*See also Culotta v. Raimondi,* 251 Md. 384, 247 A. 2d 519 (1968), *Smith v. Higinbothom,* 187 Md. 115, 48 A. 2d 754 (1946). Applying these principles, we think it clear that the general words "charges" and "fees," in the context of their use in § 48, refer only to those payments similar in nature to taxes or tax assessments. The use of the words "charges" and "fees" in the section was obviously intended to make it plain that levies in the nature of "taxes" or "assessments," even though not so denominated, were to be exempt. This conclusion is manifestly

fortified by the 1971 amendment to § 48 exempting "charges except water and sewer charges." In Baltimore City and the two counties comprising the Metropolitan Transit District, water and sewer charges are closely related to levies in the nature of taxes or assessments. See, *e.g.*, Baltimore County Code (1968 Ed.), Title 34 ("Water, Sewers, Sewage Disposal, and Drains"), §§ 34-59,[2] 34-63, 34-64; Anne Arundel County Code (1967 Ed.), Title 17 ("Taxation"), Subtitle 6 ("Water and Wastewater Charges and Assessments"), § 17-601;[3] Baltimore City Code (1966 Ed.), Article 29 ("Water"), § 29-2,[4] Article 25 ("Sewers") § 21.

Since a bridge toll is neither a tax nor a charge in the nature of a tax, we hold that the MTA is required to pay the tolls demanded by the Revenue Authority. In view of our conclusion, we neither reach nor decide the constitutional issues presented to the court below.

*Judgment affirmed with costs.*

---

2. "The assessments and charges provided for in this division shall be and constitute a lien upon the property chargeable with the same until paid. . . . All such assessments and charges, . . . shall be collected by the treasurer of the county in the same manner and at the same time as state and county taxes are collected."

3. All charges, levies, and assessments provided in this subtitle and in section 15-413 [water and wastewater connection charge] shall be a lien or charge against the real estate served and shall be levied, collected and enforced and have the same priority right, bear the same interest and penalties, and in every respect be treated as county real estate taxes."

4. "[Water rates and charges] shall be collected by the Bureau of Receipts and accounted for as in the case of taxes and other revenues collected by said Bureau."