# KADAN ET AL. *v.* BOARD OF SUPERVISORS OF ELECTIONS OF BALTIMORE COUNTY ET AL.

[No. 186, September Term, 1974.]

*Decided December 23, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

Submitted on brief by *Richard J. DiPasquale, Shirley Jean Stanton* and *Daniel O. Kadan* in proper person.

*Frank H. Newell, III,* and *James A. Gede* for appellees.

SMITH, J., delivered the opinion of the Court.

We shall here hold that it is not necessary for a judge of an orphans' court to be a member of the bar.

Petitioners, Daniel O. Kadan, Richard J. DiPasquale and Shirley Jean Stanton, are lawyers.[1] On September 24, 1974, they filed their bill of complaint in the Circuit Court for Baltimore County against the Board of Supervisors of Elections of that county (the Board) reciting that the Board had "accepted and certified the candidacy for nomination for the position of Judge of the Orphans' Court for Baltimore

---

[1]. In the bill of complaint and all of the proceedings reference has been to Daniel O. Kadan. We note, however, that O. Daniel Kadan is a member of the bar of this Court. We assume they are one and the same.

County" of a number of persons, including the plaintiffs, "the names of all of [whom] were placed on the primary ballot for nomination for the office of Judge of Orphans' Court in the primary election on the 10th day of September, 1974." It was claimed that five of the candidates, "namely T. Burgess Hamilton, Sr., Suzanne Mensh, Alexander B. Page, Jr., Frank J. Wesolowski and Warren Brown ha[d] not been admitted to practice law in any of the Courts of this State"; that the Board was "making preparations for the General Election to be held on November 5, 1974 listing the names of four of the aforesaid candidates who ha[d] not been admitted to the practice of law as required by Section 2, Article 4 of the Constitution of Maryland"; that the Board "permitted unqualified candidates to be placed on the official ballot which was used in the primary election on the 10th day of September, 1974 and [as of the time of the filing of the bill of complaint] intend[ed] to permit unqualified candidates to be placed on the official ballots to be used on November 5, 1974 as candidates seeking the nomination as Judge of the Orphans' Court for Baltimore County"; and "[t]hat the voters of Baltimore County, by virtue of the Constitution of Maryland, are unaware that they are voting for candidates who have not been certified nor do they meet the qualifications for the office of Judge of the Orphans' Court as set forth in the Constitution of the State of Maryland." It was prayed that the Board might "be enjoined from placing the names of any candidate who is not a member of the Bar of the State of Maryland or who has not been admitted to the practice of law in the State of Maryland . . . on the ballot to be used in the General Election of Baltimore County on the 5th day of November, 1974," and that the Board, "in so doing, disqualify the three Democratic candidates . . . nominated in the primary election, namely Alexander B. Page, Jr., T. Burgess Hamilton, Sr. and Suzanne Mensh, and place the names of the three qualified candidates who have accumulated the highest number of votes in the primary election as nominees for the Democratic party" for the then forthcoming general election. Alexander B. Page, Jr., T. Burgess Hamilton, Sr., and Suzanne Mensh were granted leave to intervene.

The dispute revolves around Maryland Constitution Art. IV, §§ 1, 2, and 40, which state in pertinent part:

## "Section 1. Judicial power vested in enumerated courts; courts of record; seals.

"The Judicial power of this State shall be vested in a Court of Appeals, . . . Circuit Courts, Orphans' Courts, . . . and a District Court . . . .

## "Section 2. Qualifications of judges.

"The Judges of all of the said Courts shall be citizens of the State of Maryland, and qualified voters under this Constitution, and shall have resided therein not less than five years, and not less than six months next preceding their election, or appointment, as the case may be, in the city, county, district, judicial circuit, intermediate appellate judicial circuit or appellate judicial circuit for which they may be, respectively, elected or appointed. They shall be not less than thirty years of age at the time of their election or appointment, and shall be selected from those who have been admitted to practice law in this State, and who are most distinguished for integrity, wisdom and sound legal knowledge.

## "Section 40. Election and qualifications of judges; powers; compensation; vacancies; Montgomery and Harford counties excepted.

"The qualified voters of the City of Baltimore, and of the several Counties, . . . shall . . . elect three men to be Judges of the Orphans' Courts of said City and Counties, respectively, who shall be citizens of the State, and residents for the twelve months preceding, in the City, or County, for which they may be elected. They shall have all the powers now vested in the Orphans' Courts of the State, subject to such changes as the Legislature may prescribe. Each of said Judges shall be paid such compensation as may be regulated by Law, and to be paid by the said City, or Counties, respectively.

In case of a vacancy in the office of Judge of the Orphans' Court, the Governor shall appoint, subject to confirmation, or rejection by the Senate, some suitable person to fill the same for the residue of the term."

It is the contention of the petitioners that since § 1 speaks of the judicial powers of this State being vested in certain courts including the "Orphans' Courts" and since § 2 speaks of the qualifications for "[t]he Judges of all of the said Courts," one such qualification being that the judges "be selected from those who have been admitted to practice law in this State," that it follows that orphans' court judges must be lawyers. The chancellor (Raine, J.) sustained a demurrer to the bill of complaint without leave to amend and dismissed the bill. The petitioners appealed to the Court of Special Appeals and then applied to us for the writ of certiorari prior to the hearing of the case in that court. We granted the petition and advanced the case for argument because of the public importance of the question here presented, a question not heretofore determined by this Court.

Except for the additions of provisions for "such intermediate courts of appeal, as shall be provided by law by the General Assembly," and for the District Court, and the deletion at the time of the adoption of the District Court amendment of the earlier provisions for justices of the peace, § 1 reads as it was adopted in 1867 and as it was originally reported to the floor of the Constitutional Convention of that year. *See Proceedings of the State Convention of Maryland to Frame a New Constitution* 333, 736 (1867). With the exception of slightly different language relative to the courts in Baltimore City, the section also read when proposed and adopted as did the same section in the Constitution of 1864. The language of § 2 as originally proposed and as it existed until 1966 referred only to judicial circuits. *Proceedings* at 333. No reference has been made by the litigants here to § 3, but as introduced into that convention and as adopted that section provided that "[t]he

Judges of the said several Courts [should] be elected . . . by the qualified voters in their respective Judicial Circuits . . . ." The original styling as reflected in the Report of the Committee Upon the Judiciary Department of the 1867 convention and as carried forward in the Constitution to this day reads immediately prior to § 1 *"Part I — General Provisions."Proceedings* at 333.

For historical background as to probate law in Maryland before and after the adoption of Chapter 101 of the Acts of 1798 providing for orphans' courts see 1 P. Sykes, *Maryland Probate Law and Practice* 1-9 (1956); C. Dorsey, *The Statutory Testamentary Law of Maryland* 9-15 (1838); and the address entitled "Orphans' Courts" of then Chief Judge Marbury of this Court as President of the Maryland State Bar Association, 52 Trans. of Md. St. B. Ass'n 241 (1947). Specific provision was made in § 2 of Art. IV of the Constitution of 1864 that its provisions were not applicable to the orphans' courts. The proposal of the Committee Upon the Judiciary Department of the 1867 convention was that "[t]here [should] be an Orphans' Court in the city of Baltimore, and in each of the counties of this State, to be held in the case of the city of Baltimore, by one of the Judges of the 'Supreme Court of Baltimore City' assigned thereto, and in the case of the counties by the Judges of the respective Circuit Courts . . . ." *Proceedings* at 341, and P. Perlman, *Debates of the Maryland Constitutional Convention of 1867* at 399 (1923). The provisions relative to orphans' courts and registers of wills were headed in that report "Part V — Orphans' Courts," under which heading §§ 40-41 appear today. *Proceedings* at 341. Other headings used were "Part II — Court of Appeals," "Part III — Circuit Courts," "Part IV — Courts of Baltimore City," "Part VI — Justices of the Peace," and "Part VII — Sheriffs," headings still in use except for the substitution of "Courts of Appeal" for "Court of Appeals" after provision for what is now the Court of Special Appeals and the further substitution of "District Court" for "Justices of the Peace" when the District Court replaced justices of the peace.

The 1867 convention met on May 8 for its initial session.

On May 16 Delegate Henry F. Garey of the Second
Legislative District of Baltimore City submitted a proposal
that "the Committee on the Judiciary Department consider
upon the propriety of the abolition of the Orphan's Court
system of the State, and the substitution of a method better
adapted to the transaction of testamentary business."
*Proceedings* at 47, and Perlman, *op. cit.* 73. The order was
duly adopted. On May 18 Delegate Richard H. Alvey of
Washington County, later Chief Judge of this Court,
submitted an order, likewise adopted, calling, among other
things, for "[a]bolishing the Orphans' Courts as [then]
constituted, and conferring upon said county Judge[s] all the
powers and jurisdiction thereof." *Proceedings* at 72, and
Perlman, *op. cit.* 85. When the convention took up on August
3 that portion of its committee report on the judiciary article
dealing with orphans' courts, Delegate William M. Merrick
of Howard County proposed a substitute. It was in the basic
language of the present § 40. *Proceedings* at 537, and
Perlman, *op. cit.* 399, 400. This was adopted on August 6.
*Proceedings* at 562, and Perlman, *op. cit.* 410-411. The
Perlman account must be placed in the context as stated in
the preface to it, after lamenting "the failure to preserve the
debates, [which] would have been of inestimable value in
arriving at the true construction of provisions written into
the Maryland Constitution for the first time by that
Convention," and reference to "[a] search of the files of The
Sun" for data "later used in the argument" of a case in this
Court, that "[t]he accounts in The Sun were reported with
such apparent care that it was suggested that the articles on
the Convention should be compiled and printed so as to
make them accessible to those desiring information on the
subject." Perlman records relative to the adoption of the
Merrick substitute:

> "Part five of the report, relative to the Orphans'
> Courts, was then taken up, the substitute offered
> by Mr. Merrick *(preserving the present system)* for
> the 38th section being under consideration, and the
> pending question being on the amendment of Mr.

Brent to prohibit the Orphans' Courts from the power to order sales of real estate, which was not agreed to.

‡- "After some discussion, and the rejection of various amendments, the substitute of Mr. Merrick was adopted." *Id.* at 410-11. (Emphasis added.)

Under what was the then "present system" orphans' court judges were not required to be lawyers.

In this regard it should be noted that the qualifications for an orphans' court judge set forth in § 43 of the 1864 Constitution, that he be "at the time of his election a citizen of the United States and resident for twelve months in the city or county for which he may be elected," are identical with those in § 40. The comparable section in the Constitution of 1851 was § 17 which provided that such judges should "be citizens of the State of Maryland and citizens of the city or county for which they [might] be severally elected at the time of their election." All three Constitutions provided in identical language for the orphans' courts to "have all the powers now vested in the Orphans' Courts of the State, subject to such changes as the Legislature may prescribe." No provision relative to an orphans' court appeared in the Constitution of 1776. The divisions in Art. IV of the Constitution of 1864 are identical with those in Art. IV of the Constitution of 1867, that is the styling by numbered parts with the headings "General Provisions," "Orphans' Courts," etc.

It is stated in 16 Am.Jur.2d *Constitutional Law* § 64 (1964):

"The fundamental principle of constitutional construction is that effect must be given to the intent of the framers of the organic law and of the people adopting it. This is the polestar in the construction of constitutions. A constitutional clause must be construed reasonably to carry out the intention of the framers, and should not be construed so as to defeat the obvious intent if

another construction equally in accordance with the words and sense may be adopted which will enforce and carry out the intent. The intent must be gathered from both the letter and spirit of the document, the rule being that a written constitution is to be interpreted in the same spirit in which it was produced. The court should put itself as nearly as possible in the position of the men who framed the instrument.

"Wherever the purpose of the framers of a constitution is clearly expressed, it will be followed by the courts. If the terms of a constitutional provision are not entirely free from doubt, they must be interpreted as nearly as possible in consonance with the objects and purposes in contemplation at the time of their adoption, because in construing a constitutional provision, its general scope and object should be considered." *Id.* at 239-40.

A similar statement is found in 16 C.J.S. *Constitutional Law* § 16 (1956), with citation to *Schneider v. Lansdale,* 191 Md. 317, 61 A. 2d 671 (1948), and *Beall v. State,* 131 Md. 669, 103 A. 99 (1917). Neither of these cases specifically states the rule, but in both cases this Court sought to ascertain the intent of the framers.

The title or heading of a statute has been held relevant in attempting to ascertain its intent and purpose. *Mass Transit Adm. v. Balto. Co. Revenue Auth.,* 267 Md. 687, 695-696, 298 A. 2d 413 (1973). The history of a legislative enactment has been held to often shed light upon its intent and to be of aid in construing its terms. *Truitt v. Board of Public Works,* 243 Md. 375, 389, 221 A. 2d 370 (1966). The subheadings within a constitution and its history should be considered as equally relevant.

In *New Cent. Co. v. George's Creek Co.,* 37 Md. 537 (1873), our predecessors, in construing the Constitution of this State, applied the rule of statutory construction concerning a presumption against retroactivity. Judge Alvey there

stated for our predecessors at page 557: "There can be no good reason suggested why this same general principle, so wise and just, should not also apply as a rule of interpretation of the Constitution."

In *Johnson v. Duke*, 180 Md. 434, 24 A. 2d 304 (1942), Judge Delaplaine said for this Court:

> "It is an elementary rule of interpretation that effect should be given, if possible, to every section and clause of a written Constitution; and where there is a special provision in conflict with a general provision, the special provision should be given effect to the extent of its scope, leaving the general provision to control in cases where the special provision does not apply." (Citations omitted.) *Id.* at 440.

To like effect *see* 16 Am.Jur.2d, *op. cit.* § 69. In *Thomas v. Police Commissioner*, 211 Md. 357, 127 A. 2d 625 (1956), Judge Hammond said for the Court:

> "It is a hornbook rule of statutory construction that, in ascertaining the intention of the Legislature, all parts of a statute are to be read together to find the intention as to any one part and that all parts are to be reconciled and harmonized if possible. *Bickel v. Nice*, 173 Md. 1, 6; *Baltimore v. Deegan*, 163 Md. 234, 238; *Pittman v. Housing Authority*, 180 Md. 457, 463; *Maguire v. State*, 192 Md. 615, 623; *Frazier v. Warfield*, 13 Md. 279, 301. A corollary rule of construction is that if there is no clear indication to the contrary and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory." *Id.* at 361.

*Accord, A. H. Smith Sand & Gravel v. Dep't*, 270 Md. 652, 659, 313 A. 2d 820 (1974); *Anne Arundel County v. Moushabek*, 269 Md. 419, 426, 306 A. 2d 517 (1973); *Parker v. Junior Press Printing*, 266 Md. 721, 725, 296 A. 2d 377 (1972);

*Prince George's County v. Beard,* 266 Md. 83, 91, 291 A. 2d 636 (1972); and *Baltimore City v. United Stores,* 250 Md. 361, 368, 243 A. 2d 521 (1968). We conclude that these rules should be applied here in the process of interpretation of the Constitution of this State.

Applying these rules, we note that § 2 appears under *"General Provisions"* while § 40 appears under *"Orphans' Courts."* The qualifications for judges set forth in § 2 are that they "be citizens of the State of Maryland, and qualified voters under this Constitution," and that they "shall have resided therein not less than five years, and not less than six months next preceding their election, or appointment, as the case may be, [in the area of the State from which it is mandated that] they may be, respectively, elected or appointed." They are to be "not less than thirty years of age at the time of their election or appointment" and they are to "be selected from those who have been admitted to practice law in this State, and who are most distinguished for integrity, wisdom and sound legal knowledge." The requirements of § 40, however, are that the "Judges of the Orphans' Courts . . . be citizens of the State, and residents for the twelve months preceding, in the City, or County, for which they may be elected." Not only is nothing said about their being lawyers, nothing is said about age. The time of residence within the State is not five years as in § 2, but 12 months, while the time of residence in the geographic area from which they are to be selected is 12 months, rather than six months as specified in § 2. Moreover, there is not the slightest suggestion presented here that the terms of orphans' court judges should be for 15 years as provided in § 3 for "[t]he judges of the [said] several Courts," a tacit recognition of the principles of construction we have already noted. Accordingly, the only way the Constitution can be read "so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory" is to conclude that § 2 of Art. IV applies to all courts of the State other than orphans' courts. Moreover, the contemporary account as reported by Perlman, said the delegates were "preserving the present system." That was a

system where orphans' court judges were not required to be lawyers.

We find this conclusion buttressed by yet another principle and that is, as it was put by Chief Judge Marbury for the Court in *Johns Hopkins Univ. v. Williams*, 199 Md. 382, 86 A. 2d 892 (1952):

> " 'In aid of an inquiry into the true meaning of the language used, weight may also be given to long continued contemporaneous construction by officials charged with the administration of the government, and especially by the Legislature.' *Norris v. Mayor and City Council of Baltimore*, 172 Md. 667, 675, 676, 192 A. 531, 535. 'Great weight has always been attached, and very rightly attached, to contemporaneous exposition.' Chief Justice Marshall in *Cohens v. Virginia*, 6 Wheaton 264, 418, 5 L. Ed. 257. 'A contemporaneous construction placed upon a particular provision of the organic law by the legislative department of the government, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period * * * furnishes a very strong presumption that the intention is rightly interpreted.' *Trustees of the Catholic Cathedral Church of Baltimore v. Manning*, 72 Md. 116, 130, 19 A. 599, 603. *Wyatt v. State Roads Commission*, 175 Md. 258, 264, 1 A. 2d 619. 'While the construction of statutes or constitutional provisions is a judicial function, courts may, in declaring their meaning and effect, avail themselves of the construction put upon them by the Legislature by long continued custom and acquiescence.' *Humphreys v. Walls*, 169 Md. 292, 299, 181 A. 735, 738." *Id.* at 386-87.

There is no doubt but what the leading members of the legal profession of this State from 1867 until the present time have been of the view that orphans' court judges were not required to be lawyers. Indeed, members of this Court can

attest from their own experience and practice to the presence of non-lawyers on the Orphans' Court of Baltimore City in comparatively recent times. Only eleven years after the adjournment of the Constitutional Convention of 1867 Edward Otis Hinkley of the Baltimore City Bar wrote in the preface to his *Testamentary Law in Maryland* (1878):[2]

> "And I have included also the law of Inheritance of Real Estate, and the law of Apprentices, because the Orphans' Courts have jurisdiction over both of these subjects, and the work is, in a great measure, designed for the benefit of the Judges of these Courts, *many of whom are not learned in the law.*" *Id.* at v. (Emphasis added.)

The comment is made in A. Niles, *Maryland Constitutional Law* (1915), relative to § 40 of Art. IV:

> "It will be noticed that the only constitutional qualification for a judge of the Orphans' Court is that he must be a citizen of the State of Maryland and a resident for the twelve months preceding, in the city or county for which he is elected. It is evident that the framers of the Constitution had before them the advantage of saving expense to parties interested in a decedent's estate, and providing for such parties a court easy of access and untrammeled by formal procedure, and did not place much value upon the benefit that such persons might derive from having estates settled under the supervision of competent lawyers.
>
> "A judge of the orphans' court may, under our Constitution, never have looked inside of a law book before he takes his seat upon the bench, and it is to the credit of the voters, and not of the Constitution, that the judges chosen, often possess marked

---

2. Hinkley, as an observer of the Maryland scene, prepared annotations and notes to the Constitutions of 1851, 1864, and 1867. See W. Hunter, A Baltimore Law Firm 1817-1967 20 (1967). His Constitution of the State of Maryland 1867 (1868) reflects nothing on the problem here at hand.

ability to discharge the duties of their office." *Id.* at 274-75.

The late Judge Morris A. Soper is authority for the fact that a paper presented by then Attorney General William C. Walsh to the mid-winter meeting of the Maryland State Bar Association in 1941 revived interest in judicial reform in Maryland, leading to the appointment of what came to be known as the Bond Commission. *See* M. Soper, *Reorganization of the Court of Appeals of Maryland,* 8 Md. L. Rev. 91, 98 (1944). The Commission on the Judiciary Article of the Constitution of Maryland, the "Bond Commission," appointed by Governor Herbert R. O'Conor on November 1, 1941, was a truly outstanding one.[3] Under the caption "The Orphans' Courts" the Report of the Commission on the Judiciary Article of the Constitution of Maryland (1942) states:

> "Consultation of members of the commission with lawyers and others from various parts of the state has disclosed a widespread opinion that the jurisdiction over matters of probate and the administration of estates of deceased owners should now be committed to the trained judges of the trial courts, and that the Orphans' Courts should be abolished. Plainly the work of the courts of untrained laymen in the counties causes dissatisfaction. This is the opinion of members of the commission, and they recommend that the

---

3. This Commission was composed of Messrs. Carroll T. Bond, Charles Markell, F. W. C. Webb, Walter C. Capper, Samuel J. Fisher, S. Marvin Peach, Eli Frank, Harry N. Baetjer, J. Howard Murray, Clarence W. Miles, Joseph Bernstein, F. Neal Parke, G. C. A. Anderson, and Edward D. E. Rollins. The Chairman, Judge Bond, was then the Chief Judge of this Court. Judge Markell was later Chief Judge. Judge Parke had just retired from this Court and Judge Capper later served on this Court. Two of the group, Messrs. Murray and Rollins, became circuit court judges while Judge Frank was then sitting as a Judge of the Supreme Bench of Baltimore City. Mr. Rollins also later became Attorney General of Maryland. Nine of the group, Messrs. Markell, Webb, Capper, Frank, Miles, Bernstein, Parke, Anderson, and Rollins either had been or were to become Presidents of the Maryland State Bar Association. Mr. Webb was then Chairman of the State Board of Law Examiners.

change be made, both in the counties and in Baltimore City, effective January 1, 1947, when the terms of the judges elected in the November, 1942, election will expire.

"The use of persons untrained in the law as judges of the Orphans' Courts is a survival of the practice existing before the Revolution, when trained lawyers were not required on any court of the province, although the need of training was in fact bringing lawyers to the higher courts before 1776. Beginning with the constitution of that year, all other courts of the state were by the year 1805 equipped with trained judges, but although the problems to be disposed of in probate and administration of estates were of no lesser importance and difficulty lawyers have not been required to preside over Orphans' Courts. The result has been that the regular courts of law and equity have been made available to aid in the disposition of special matters, and this division and duplication of machinery still exists. In recognition of the need for it, the Orphans' Court of Baltimore City has in practice been equipped with trained lawyers in recent years . . . ." *Id.* at 11-12.

As we have already indicated, Chief Judge Ogle Marbury took occasion as President of the Maryland State Bar Association to address the association on the subject of "Orphans' Courts." He referred to the statement of our predecessors in *Scott v. Burch,* 6 Har. & Joh. 67 (1823):

"By the 15 sub-ch. sec. 20, of the testamentary system, (1798, ch. 101,) it is declared that the Orphans' Court shall not, under pretext of incidental power or constructive authority, exercise any jurisdiction whatever, not expressly given by that Act or some other law. And to avoid the necessity of a recurrence to incidental or implied authority, the powers of the Orphans' Court, both in relation to the subject-matter of its jurisdiction,

and the forms of its proceeding, are declared with the most formal and precise minuteness." *Id.* at 79.

He then went on to say:

"It cannot be doubted that this restriction of the powers of the Orphans' Court which has continued to this day, and which has caused many difficulties which would not be experienced by any court of general jurisdiction, was due to the fact that the judges were not lawyers and it was not thought wise to give them any but the most limited jurisdiction." 52 Trans. of Md. St. B. Ass'n at 253 (1947).

At another point he said:

"It is a matter of interest to note that from the days of the provincial commissary down to the present time, there has been recognition of the incongruity of permitting laymen to pass upon legal matters concerned with the settlement of the estates of deceased persons." *Id.* at 256.

In a concluding paragraph, he referred to the "lack of legal knowledge on the part of the Orphans' Court Judges [as] damaging and detrimental to the interests of those coming under their jurisdiction." He then said:

"Eventually this must be changed. All lawyers know the danger, the delay and the added expense of having legal decisions made by laymen. The average individual does not realize how much easier, how much less expensive and how much more effective would be the administration of estates under the method proposed by the Bond Commission. The average individual, as a matter of fact, does not know anything about it. But when he is made to understand that at least 90% of the orders signed by Orphans' Courts are merely matters of form which could be just as easily signed by the Register of Wills, he would see no reason for

paying salaries to 72 extra state officials for doing this work. And when he understands that in the remaining cases important questions of law have to be decided by individuals who have no legal training, he will begin to wonder why we have kept this system so long. The reasons which caused its adoption no longer exist, and it will be changed as soon as the public realizes that it is kept solely to provide offices. No politician, however short-sighted, can afford to stand in the way of a public demand to improve this important part of our judicial system. It is part of our obligation as lawyers to see that the public understands the situation. When this happens, Orphans' Courts will be abolished." *Id.* at 258.

As a result of the address by Judge Marbury there was appointed by the association a Committee on Abolishing Orphans' Courts.[4] That committee, in its report submitted at the mid-winter meeting of the Maryland State Bar Association in 1948, said:

"The judges are selected, in the great majority of instances, in the light of their claims upon or value to the controlling party organizations with which they are affiliated rather than because of their capacity to serve or any real need for their services. They are (with rare exceptions) untrained in the law and without any other special knowledge qualifying them to deal with or determine problems incident to the administration of estate. Indeed it can be fairly said that, in the counties, the so-called judges are little more than honest and sincere

---

4. That committee, too, was a distinguished one. It included Clarence W. Miles, Chairman; Eli Frank; William R. Semans; James H. Pugh; G. C. A. Anderson; Edward H. Burke; M. Hampton Magruder; William A. Gunter; Albert L. Sklar; and S. Scott Beck, Jr. In addition to the ones we have already mentioned, Mr. Burke was to become a President of the Maryland State Bar Association. Mr. Pugh became Chief Judge of the Sixth Judicial Circuit. Mr. Sklar became Chairman of the Public Service Commission of Maryland and is now an Associate Judge of the Supreme Bench of Baltimore City.

laymen who discharge their duties by striving to comply with the advices or instruction of the Registers of Wills. It is a happy circumstance that, so far as your Committee can ascertain, the offices and functions of the Registers of Wills in this State are administered with marked ability. If such were not the case, any experienced lawyer whose professional duties bring him in frequent contact with the Orphans' Courts, particularly in the counties, can readily imagine the chaos that would prevail in those courts." 53 Trans. of Md. St. B. Ass'n 28, 29 (1948).

In 1965 Governor J. Millard Taws appointed a Commission to Study and Revise the Testamentary Laws of Maryland, under the chairmanship of the Honorable William L. Henderson, a former Chief Judge of this Court.[5] In the letter of transmittal of its second report to the Governor and the General Assembly of Maryland the Commission said:

"The Commission takes no position on such questions as the desirability of continuing the use of lay judges, the various and varied compensations paid judges in the different counties and Baltimore City, the operation of the Registers' offices on a fee basis, the fixing of their salaries by the Board of Public Works, the provision for the mandatory approval by the Comptroller of the employment and compensation of all employees in the offices of the Registers, and the utilization of the Registers as tax collectors. The Commission's failure to call for changes in these traditional procedures is not to be taken as an expression of approval, but simply that these subjects seem to fall outside the scope of study of the law called for in the Joint Resolution to which we owe our existence as a commission."

5. The commission included in its membership Thomas M. Anderson, Jr.; Robert L. Karwacki; Thomas Hunter Lowe; Joshua W. Miles; Roger D. Redden; James M. Roby; John G. Rouse, Jr.; Ruth R. Startt; Shale D. Stiller; G. Van Velsor Wolf; Gertrude C. Wright; and C. M. Zacharski, Jr.

*Second Report of Governor's Commission to Review and Revise the Testamentary Law of Maryland* at i (1968).

The Commission commented as a preamble to its proposed section on the orphans' courts:

"[T]he Article continues the system of utilizing the three judge Court (the members of which need not be and, with the exception of Baltimore City, usually are not even members of the Bar), the varied methods of compensating the Judges in different Counties, the operation of the offices of the Registers of Wills on a fee basis, the fixing of the salaries of the Registers of Wills by the Board of Public Works, the provision for the mandatory approval by the Comptroller of the employment and compensation of all employees in the offices of the Registers of Wills, and the like. This fact is not to be construed as representing either approval or disapproval of such provisions by the Commission or by any of its members." *Id.* at 14.

This comment is now reprinted immediately preceding Maryland Code (1974) § 2-101, Estates and Trusts Article.

In Committee Memorandum No. JB-1 accompanying Committee Recommendation No. JB-1, from the Committee on the Judicial Branch of the Constitutional Convention of 1967, it was said: [6]

"All Orphans' Courts have three judges. Maryland Constitution, Art. IV, Sec. 40. In most jurisdictions, except Baltimore City, these judges are laymen. . . .

"In short, the bulk of probate work, while important in nature, is administrative in character.

---

6. The writer of this opinion was a member of the committee. He has personal knowledge of the fact that the committee report was the work of its Chairman, the late F. DeSales Mudd; its Vice-Chairman, former Chief Judge William L. Henderson of this Court; and the Committee's Staff Advisor, William H. Adkins, II, now State Court Administrator.

Those few estates involving actual litigation should be handled by fully-qualified full-time judges, just as other litigated matters are. There is no justification for retaining, as part of the Constitutionally-established judicial system, a separate Orphans' Court staffed for the most part by *lay judges*, sitting perhaps once a week for the purpose of signing routine orders." (Emphasis added.)

On the basis of the history of § 40 extracted from the proceedings of the Constitutional Convention of 1867, the interpretation of the Constitution following the usual procedures and rules for constitutional and statutory interpretation, the interpretation almost contemporaneous with its adoption by Hinkley, and the long continued interpretation of the provisions by distinguished members of the legal profession of this State, including the view of it acquiesced in or stated by former Chief Judges Bond, Markell, Marbury, and Henderson of this Court and former Judges Parke and Capper of this Court, we conclude that Art. IV, § 2 of the Maryland Constitution is not applicable to judges of the orphans' courts and, therefore, they are not required to be members of the bar.

*Order affirmed; appellants to pay the costs.*